**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Sara Fuks (*Pro Hac Vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re Exscientia p.l.c. Securities Litigation | **Case No. 1:24-cv-05692-RMB-AMD**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Frank Campanile and named Plaintiff Robert Sullivan ("Plaintiffs" or "Investors") alleges the following based upon personal knowledge as themselves and their own acts, and upon an investigation conducted by and through their attorneys, which included a review of the Securities Exchange Commission

("SEC") filings by Exscientia p.l.c. ("Exscientia" or the "Company"), media and analyst reports about the Company, Company press releases, Defendants' (defined below) public statements and other information available via the internet, and information obtained from individuals with knowledge about the events discussed herein. Plaintiffs believe that substantial additional evidentiary matter will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Investors bring this securities class action on behalf of a class consisting of all persons and entities who purchased Exscientia's common stock or purchased Exscientia call options or sold put options (including any Exscientia common stock purchased or otherwise acquired in connection with the exercise of such options) between March 23, 2022, and February 12, 2024, both dates inclusive, and who were damaged thereby (the "Class Period"). Investor seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). The action charges that the defendants named herein violated 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission.

## PRELIMINARY STATEMENT

2.      Exscientia is a UK based biotechnology company which uses Artifcial Intelligence ("AI") to aid the drug discovery process. Exscientia is the brainchild of Andrew Hopkins, a pioneering scientist and entrepreneur who formed Exscientia out

of his academic lab at the University of Dundee in Scotland in 2012.

3.    Through Hopkins's scientific talent and ingenuity, he was able to attract early investors like the Bill and Melinda Gates Foundation, and partner with pharmaceutical giants like Sanofi and Bristol Meyers Squibb.

4.    By 2021 Hopkins had turned Exscientia from a 12-person company formed at an academic lab into a company valued at $2.9 billion. Exscientia's IPO closed in October 2021, having raised $510 million in financing. Its American Depositary Shares (ADS) began trading on the NASDAQ.

5.    Investors and analysts squarely attributed Exscientia's success and valuation to Hopkins, who Time Magazine recognized as one of the "most influential people in AI," and who the Guardian called "the man using AI to cure disease." In 2023 Hopkins was even elected to two of the UK's national academies in recognition of his "exceptional contributions to science."

6.    In March 2022 Exscientia filed its first annual report on Form 20-F with the SEC since becoming a publicly traded Company. Given that Exscientia's CEO and founder (now also Executive Director) was so instrumental to the Company's valuation, Exscientia's Class Period annual reports stated that the Company's success depended on its ability to retain its key executives and warned investors that the loss of executives could seriously harm the Company.

7.    Exscientia's Class Period 20-F's referenced and directed investors to Exscientia's Code of Business Conduct and Ethics, which the Company "operates

pursuant to." The Code stated that employees- including the CEO and all executives and directors- were required to act with the utmost integrity and honesty and adhere to the highest ethical standards, including avoiding conflicts of interest or the appearance thereof, and forbade cutting ethical corners for personal benefit. The Code of Conduct made clear that its provisions were requirements, not aspirations. The Code of Conduct further provided a mandatory detailed reporting structure for violations of the Code and promised that if any executive or director obtained a waiver of any provision of the Code, the Company would immediately alert shareholders.

8.     Exscientia's Class Period 20-F's also emphasized the importance of its culture, representing that it would ensure that Exscientia remains "an inclusive and welcoming place to work for all" committed to "sex, racial and cultural diversity at all levels in the organisation." Exscientia's Class Period Annual Reports referenced the "human rights" of its employees, and the Company's commitment to "ensuring employees are free from discrimination and coercion" and "monitor[ing] and promot[ing] a healthy corporate culture."

9.     Consistent with a 2017 UK law mandating employers report the differential in pay between males and females, Exscientia issued a "Gender Pay Gap Report" highlighting concrete actions the Company undertook to foster a diverse workforce which ensured more positions were filled by females.

10.     With the societal shift that took place alongside the #MeToo Movement, investors watched sexual harassment controversies destroy formerly high-powered

executives like CBS's Les Moonves, causing stock prices and reputations of the companies they led to plummet. Accordingly, adherence to a Code of Conduct and a workplace free from discrimination and coercion (and its attendant legal and reputational risks) was highly material to investors.

11.     Defendants were likewise aware of the damage harassment and inappropriate workplace relationships could cause Exscientia given the recent high-profile CEO firings in the UK of McDonald's CEO Steve Easterbrook in 2019 and BP plc CEO Bernard Looney in 2023.

12.     Unbeknownst to Investors, contrary to Defendants' purported strict adherence to the Code of Conduct and corporate "culture of respect", gender equality, and "freedom from coercion," throughout the Class Period Hopkins engaged in a pattern of toxic behavior toward female employees at Exscientia, including sexual harassment, intimidation and relationships with subordinate female employees, which Exscientia's Chairman of the Board knew about and actively concealed by secretly engaging outside counsel to aid the cover-up.

13.     According to Hopkins's former Strategic Assistant- who reported to and worked directly with him- Hopkins behaved inappropriately towards her which traumatized her so much that she left the Company, moving hundreds of miles away to escape Hopkins, and left the biotech industry altogether. She did not have a consensual relationship with Hopkins and was scared of him given his menacing behaviour.

14.    Hopkins's former Strategic Assistant said she was aware of at least one other Exscientia female employee who was a victim of Hopkins's misconduct, and that Hopkins also had an undisclosed relationship with his former Executive Assistant.

15.    Hopkins's former Strategic Assistant reported his misconduct to Exscientia's Chairman of the Board, David Nicholson, in August 2022. Nicholson was also the Chairman of Exscientia's Nominating and Corporate Governance Committee, and a member of its Audit and Remuneration Committees. His responsibilities on these Committees, and his pledge under the Code of Conduct take action in response to any unethical conduct, required him to "communicate with the Board" concerning directors, consider whether directors "can and do provide" "integrity" and "judgment" "appropriate for the Company," "promptly disclose to the Board full details of any wrongdoing by any executive," "monitor and oversee" executives' "compliance with the Company's policies…including the Code of [Conduct]," "evaluate the Chief Executive Officer's performance" and whether he "foster[s] a corporate culture that promotes the highest levels of integrity and the highest ethical standards."

16.    Despite Exscientia both requiring and directly empowering Nicholson to take action and report Hopkins's misconduct to the Board and ensure that it cease, Nicholson, according to Hopkins's Strategic Assistant, "did nothing at all" after she informed him of it.

17.    In truth and in fact, Nicholson concealed Hopkins's misconduct and engaged outside counsel to deal with the situation behind the Board's back.

18.    On February 13, 2024, Exscientia shocked the market when it issued a press release revealing the decision to terminate Hopkins as CEO and remove him from his role as Executive Director of the Board "in each case for cause and effective immediately." Exscientia's press release stated that an investigation found that Hopkins "had engaged in relationships with two employees that the Board determined were inappropriate and inconsistent with the Company's standards and values."

19.    Exscientia's press release further revealed that during its investigation into Hopkins's misconduct it discovered that Defendant Nicholson had "prior knowledge of the existence of the earlier of Dr. Hopkins' relationships and had addressed the situation directly, and with the involvement of other outside counsel, rather than in consultation with the Board." After "discussions with the Board" Nicholson resigned.

20.    On this news, Exscientia's stock price fell $1.72 per share, or 22.9%, to close at $5.79 per share on February 13, 2024, damaging investors. This decline was the largest single-day decline Exscientia stock experienced in the Company's history, with trading volume of over seven times the volume two days prior.

21.    This action seeks to recover Exscientia investors' losses which were caused by Defendants' false statements alleged herein.

## JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

24.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Exscientia's most recent Annual Report filed with the SEC, as of December 31, 2023, there were 125,702,396 of the Company's ordinary shares outstanding.  Exscientia's American Depository Shares ("ADSs") and common stock trade on the Nasdaq Global Select Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Exscientia securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

25.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

26.    Lead Plaintiff Frank Campanile purchased Exscientia securities at artificially inflated prices and suffered damages as a result of the federal securities laws violations alleged herein. Mr. Campanile's PSLRA certification was filed at Dkt. No. 3-6 and is incorporated by reference herein.

27.    Named Plaintiff Robert Sullivan purchased Exscientia securities at artificially inflated prices and suffered damages as a result of the federal securities laws violations alleged herein. Mr. Sullivan's PSLRA certification is attached hereto as Exhibit A and is incorporated by reference herein.

28.    Defendant Exscientia was founded by Andrew Hopkins in 2012. Exscientia uses artificial intelligence ("AI") to aid drug discovery. Exscientia's American Depositary Shares ("ADS") began trading on the NASDAQ under the ticker symbol "EXAI" following its IPO in October 2021. Exscientia is a United Kingdom public limited company with its principal executive offices located at The Schrodinger Building, Oxford Science Park, Oxford, United Kingdom, OX4 4GE.

29.    Defendant Andrew Hopkins ("Hopkins") is Exscientia's founder and served as Exscientia's CEO, and executive director prior to and during the Class Period. Hopkins beneficially owned approximately 16% of Exscientia's shares during the Class Period. According to Exscientia's Class Period SEC filings, Hopkins's "extensive experience in the healthcare industry and being a founder of our company qualifies him to serve on our board of directors."

30.    Defendant David Nicholson ("Nicholson") served as the Chairman of Exscientia's Board of Directors during the Class Period. Nicholson also served at the Chairman of Exscientia's Nomination and Corporate Governance Committee during the Class Period. The Nomination and Corporate Governance Committee's responsibilities included "*assessing* the functioning of" individual directors and executive officers and "*reporting* the result of such assessments to the board." Additionally, Nicholson served as a member of Exscientia's Audit Committee and Remuneration Committee during the Class Period. According to Exscientia's Class Period SEC filings, Nicholson's "extensive experience in the healthcare industry qualifies him to serve on our board of directors."

31.    Defendants Hopkins and Nicholson are sometimes referred to herein as the "Individual Defendants."

32.    Each of the Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

33.    Defendant Exscientia and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Andrew Hopkins and His Pivotal Role in the Success and Valuation of Exscientia*

34.    In 2012 Andrew Hopkins founded Exscientia, which means "from knowledge." Hopkins came up with the idea of using AI to develop drugs in the mid-nineties, when he was a young scientist studying for a PhD in biophysics at Oxford.

35.    Exscientia spun out of Hopkins's lab at the University of Dundee to form a company that combined expertise in drug discovery with new technology.

36.    Unlike other fledgling companies that raised capital from angel investors or venture capital firms, Exscientia set up research projects with companies like Lilly, Janssen, and Sunovion, which, as Hopkins described "meant [Exscientia] had non-dilutive revenue that allowed us to develop the company…but more importantly, work with pharma companies conducting real projects to test the system and show that it works."

37.    By 2017 Exscientia had signed deals with Sanofi and GlaxoSmithKline and opened a new office in Oxford to supplement the lab in Dundee. Hopkins began

reducing his university responsibilities to focus on building Exscientia's business.

38.    By 2020, Exscientia had originated the first three AI-designed precision drug candidates to enter human clinical trials.  Exscientia had more than 25 active projects in total, with its platform focusing on potential cancer treatments through AI analysis.  Exscientia collaborated with pharmaceutical giants like Bristol Meyers Squibb and Sanofi as well as the Bill and Melinda Gates Foundation.

39.    Having built Exscientia from the ground up, Hopkins was ready to take it public. On October 5, 2021, Exscientia announced the completion of its IPO offering 13,850,000 ADS at a price of $22.00 per share.

40.     In connection with the IPO SoftBank and the Gates foundation purchased 5,681,818 and 1,590,909 ADSs, respectively, in a private placement concurrent with the IPO at the IPO price of $22.00 per ADS. Exscientia raised $510.4 million in financing from the IPO and private placement, and Excientia's ADS began trading on the NASDAQ under the ticker symbol "EXAI." Exscientia was considered a "massive success: the fastest growing biotechnology company in the UK…" The IPO valued Exscientia at $2.9 billion. Hopkins owned approximately 15% of its stock.

41.    Hopkins's notoriety and the accolades he received for his pioneering work continued to grow after Excientia's IPO.

42.    The Principal and Vice-Chancellor of the University of Dundee noted that "the success of Exscientia is grounded in Andrew's unique blend of interdisciplinary thinking across chemistry, computer science and pharmacology, as well as his ability

to innovate and his entrepreneurial flair."

43.    In October 2022 Exscientia won the *Prix Galien*, a global award that is considered the highest accolade for pharmaceutical research and development.

44.    In September 2023 Hopkins was featured on the inaugural TIME 100 list of most influential people in AI.

45.    Given Hopkins's status and achievements, Alex Zhavoronkov, CEO of rival AI drug discovery company Insilico Medicine, referred to Hopkins as Exscientia's "high-impact celebrity CEO."

46.    Indeed, Hopkins was the backbone of the Company and one of its most valuable assets given his rare combination of academic achievement and scientific talent and strong entrepreneurial skills. Unsurprisingly, news of his termination sent the Company's shares plunging by 23%, the largest single day stock price decline in Exscientia's history as a publicly traded company.

### *The MeToo movement, Subsequent High-Profile CEO Terminations for "Inappropriate Relationships," and Proposed UK Legislation Defines the Landscape Surrounding Sexual Misconduct in the Workplace*

47.    The permissive workplace environment of the aughts, where sexual harassment and inappropriate relationships marked by power imbalances was tolerated with a wink and a nod, gave way to the #MeToo Movement. MeToo arose in 2016 with executive firings at FoxNews and crystallized in 2017 when *The New Yorker* published its expose on Harvey Weinstein.

48.    In 2019 the UK government announced it would create a new statutory

code of practice addressing sexual harassment in the workplace. The code would require employers to take "all reasonable steps" to prevent workplace harassment. The decision came after a 2018 research report by parliament's Women and Equalities Committee and inquiry on Sexual Harassment in the Workplace which showed that 40% of women have experienced unwanted sexual behavior at work at some point.

49.    The shift in attitudes towards victims of sexual harassment in the workplace and intolerance of inappropriate workplace relationships was apparent to Defendants given the many high-profile CEO firings in both the U.S. and UK leading up to and during the Class Period.

50.    For example, in 2019 the British CEO of McDonald's Steve Easterbrook was removed by the board as CEO for violating corporate policies on personal conduct by having a relationship with a company employee.

51.    In 2023, Bernard Looney, then CEO of BP plc, was fired for "serious misconduct" for not fully disclosing his personal relationships with employees.

52.    As SEC Enforcement Director Gubir Grewal stated, "when corporate officers corrupt internal processes to manage their personal reputations or line their own pockets, they breach their fundamental duties to shareholders."

53.    The dangers associated workplace relationships beteeen employees and executives are obvious. As one journalist stated, CEO's have "few if any equals at the company, which could make a consensual relationship incredibly complicated. At the very least it's messy and distracting. But at worst it could blur the confines of consent

altogether: When the person you're with has the power to fire you, you may consent to things that you otherwise would not. This is what an abuse of power in an 'office romance' can look like, as high-profile examples have shown.[1]"

54.     According to the CEO of the Society for Human Resource Management, "in the wake of #MeToo, boards are on high alert for anything that poses a reputational or financial risk to the company." For this reason, relationships between executives and subordinates pose potential conflicts of interest.[2]

55.     Additionally, since 2017 the UK government has required public, private, and voluntary sector employers with 250 or more employees to report annually on their gender pay gap. Companies must report a comparison of the median or average pay of women versus the median or average pay of men (*e.g.,* "women earn 10% less than men"). It is optional for employers to include an accompanying narrative to add context to any pay gaps, together with an action plan setting out what steps will the taken. Neither the narrative nor the action plan is mandatory.

56.     In addition to simply reporting the percentage pay gap in its Gender Pay Gap Report Exscientia chose to include a narrative and action plan which portrayed Exscientia as a progressive and inclusive work environment dedicated to advancing the careers of women in biotech.

---

[1] Michelle Ruiz, *No, CEO's Shouldn't Date Their Employees*, Nov. 4, 2019, Vogue.
[2] Jeanne Sahadi, *When CEO's date employees, it can get messy fast,* Nov. 9, 2019, CNN.

57.     When Exscientia became a publicly traded Company in 2021 it established a Code of Business Conduct and Ethics ("Code of Conduct") which remained in place throughout the Class Period. The Individual Defendants attested to adherence with the Code of Conduct. The Code of Conduct forbade cutting ethical corners for personal benefit, required personnel to act with integrity and honesty, avoid even apparent conflicts of interest, and set forth detailed reporting requirements for any violations of the Code. The Board of Directors was required to approve a waiver of any provision of the Code and promised that Exscientia would disclose to shareholders any waiver obtained by an executive or director of the Company.

### Hopkins Engaged in Systematic Sexual Harassment, Inappropriate Relationships and Intimidation

58.     Former Employee 1 ("FE 1") is a former employee of Exscientia who served as the Strategic Assistant to the CEO at Exscientia from November 2021 to December 2022.[3] FE1 reported directly to Defendant Hopkins.

59.     FE1 stated that she is one of the women that Exscientia's February 13, 2024 press release referenced as having engaged in a "relationship" with Defendant Hopkins which led to his termination. FE1 stated that while Exscientia's press release depicted the two as having a "relationship," what occurred between herself and Defendant Hopkins was not consensual. Instead, FE1 explained, Hopkins was simply

---

[3] The identities of the Former Employees referenced herein ("FE1" and "FE2") are known to Plaintiffs' Counsel. Plaintiffs' Counsel will provide their identities to the Court should it so request.

"behaving inappropriately" towards her, an experience which traumatized her.

60.    FE1 stated that she reported Hopkins's misconduct to Defendant Nicholson in around August 2022. FE1 stated that she was the first person to inform Nicholson about Hopkins's inappropriate behavior towards her. FE1 stated, however, that Nicholson did "nothing at all about it."

61.    As Exscientia admitted, Nicholson did not report Hopkins's misconduct to Exscientia's full Board of Directors but instead engaged outside counsel and concealed Hopkins's misconduct. FE1 also stated that an Exscientia employee informed her that Hopkins's own wife, (who worked at Exscientia since 2016 as its vice president of biophysics), reported Hopkins's misconduct to the Company's Board of Directors.

62.    Given Hopkins's misconduct towards FE1 and Nicholson's refusal to act after FE1 reported him, FE1 stated that she felt she "had no choice but to leave" the Company.  Hopkins's inappropriate behavior towards FE1, she explained, prompted her to "move hundreds of miles to get away" from Hopkins. FE1 was so traumatized by Hopkins's misconduct towards her and the Company's failure to act in the face of it, that she stated that she left the biotech industry entirely.

63.    FE1 also stated that there was at least one other another female employee at Exscientia that she was aware of who also was a victim of Hopkins's misconduct. FE1 added that Hopkins displayed a "pattern of toxic behavior towards women."

64.    FE1 stated candidly that she was "scared" of Hopkins because he is a

"very clever man."

65.    FE1 stated that the other individual referenced in the Company's press release as having had a relationship with Hopkins is Former Employee 2 ("FE2"). FE 2 worked at Exscientia from 2017 through 2023. Between July 2017 and October 2021 FE2 was the Executive Assistant to the CEO.

66.    FE1 explained that FE2 engaged in a relationship with Defendant Hopkins. FE1 explained that FE2 "carries a torch for Hopkins bigger than the Statue of Liberty." FE1 stated that she believed given FE2's dedication to Hopkins, she would likely "lie under oath to protect" him. FE1 stated that Hopkins's relationship with FE2 began years prior to Hopkins's inappropriate behavior towards FE1.

67.    FE1 stated that Hopkins was starting a new company called Xyme and was worried that Hopkins would continue his inappropriate behavior towards women at this company.

### Defendants Knew About Hopkins's Conduct, But Failed to Protect Female Employees or Take Required Actions

68.    Throughout the Class Period, Defendant Nicholson, whose scienter is imputed to Exscientia under principles of corporate scienter (*See* ¶136 *infra*), was well aware of Hopkins's misconduct and permitted it to continue despite Nicholson's responsibilities as Chairman of the Company's Board, Chair of the Company's Nominating and Corporate Governance Committee, and membership on the Company's Audit and Remuneration Committees.

69.    As FE1 stated, FE1 told Nicholson about Hopkins's misconduct in August of 2022. Nicholson did nothing to help her or stop Hopkins, and actively concealed Hopkins's misconduct from the Board, engaging outside counsel behind their backs.

70.    At all relevant times Defendant Nicholson served as Chair of Exscientia's Nominating and Corporate Governance Committee of the Board of Directors. The Charter of the Nominating and Corporate Governance Committee, which is referenced in the Company's Class Period 20-F's and Annual Reports, provides that its purpose is to: "oversee the Company's corporate governance function", "identify, evaluate, recommend, and communicate with candidates qualified to become board members… and "*make other recommendations to the Board relating to the directors of the Company*." The Nominating and Corporate Governance Committee is authorized to "*communicate with the Board.*" Further, "[i]f the Committee concludes it must retain legal, accounting, or other outside advisors [it should] do so and determine compensation for those advisors at the Company's expense."

71.    Additionally, the Corporate Governance Committee must "identify and *evaluate candidates, including nomination of incumbent directors for re-election of nominees….to serve on the board*" using criteria including "*potential conflicts of interest*, director independence and *other requirements,*" "*periodically review the performance of the Board,*" and consider "*whether the directors, both individually and collectively, can and do provide integrity, experience, judgment*, commitment,

skills, diversity and expertise *appropriate for the Company*."

72.    With respect to "Environmental, Social and Corporate Governance (ESG) Matters," the Corporate Governance Committee must "*Oversee and periodically review* ESG matters relevant to the Company business and operations, including policies and practices concerning (i) *corporate social responsibility*…[and] *employee diversity.*"

73.    Nicholson's knowledge of Hopkins's misconduct, which FE1 directly informed Nicholson of, and his responsibilities as Chair of the Nomination and Corporate Governance Committee required Nicholson to act.

74.    In contravention of his responsibilities as Committee Chair Nicholson failed to: (1) "make recommendations to the Board" that Hopkins be terminated;  (2) "communicate with the Board" concerning Hopkins's behavior; (3) determine that Hopkins should not be "re-elected…to serve on the Board" because of his misconduct; (4) determine that Hopkins, as an "individual director" did not provide the required "integrity" and "judgment" "appropriate for the company"; and (5) "oversee" "corporate social responsibility" and "diversity" because he allowed Hopkins to continue to behave in a socially and ethically irresponsible manner which perpetuated lack of gender diversity because it essentially forced female employees like FE1 who were victims of Hopkins's harassment to leave Exscientia (and the biotech industry altogether, in FE1's case).

75.    And while Nicholson decided to "retain legal advice" concerning

Hopkins's misconduct he did so to conceal it, and without consulting the other members of the Nomination and Corporate Governance Committee.

76.    When Exscientia completed its initial public offering in 2021 it entered into an employment agreement with Hopkins ("Hopkins's Employment Agreement"). Hopkins's Employment Agreement remained in place throughout the Class Period[4].

77.    Hopkins's Employment Agreement required that he comply with the Company's Code of Conduct and promptly disclose the details of any wrongdoing to Exscientia's full board of directors.

78.    Hopkins's Employment Agreement provides, in relevant part: "***Scope of Employment. Duties of the Executive***. During the employment the Executive shall:…***do or refrain from doing, such things as are necessary…to ensure compliance by himself…with…any codes of practice*** issued by [the Company]…,"refrain from doing anything which would cause him to be disqualified from acting as a director"…., and "***promptly disclose to the Board full details of any wrongdoing*** by the Executive or any other employee of any Group Company where that wrongdoing is material to that employee's employment by the relevant company or to the interests or reputation of any Group Company."

---

[4] Exscientia included Hopkins's Employment Agreement, executed on September 24, 2021, as an exhibit to the Company's Amended Draft IPO Registration Statement filed on Form F-1 with the SEC on September 27, 2021, https://www.sec.gov/Archives/edgar/data/1865408/000110465921119607/tm211978 3d12_ex10-2.htm

79.    Pursuant to Hopkins's Employment Agreement, the Company could terminate his employment "for cause" and immediately if Hopkins were to engage in "any gross misconduct or behaviour which tends to bring himself or the Company…into disrepute" or "if his behaviour [ ] can be reasonably regarded as materially prejudicial to the interests of the Company…"

80.    As the Company admitted, Exscientia did terminate Hopkins for "cause." Indeed, Hopkins's behavior constituted "gross misconduct" which brought Exscientia "disrepute" and materially prejudiced the Company by causing it to lose key talent, tarnish its reputation and cause its share price to drop.

81.    Despite being aware of the terms of Hopkins's Employment Agreement and the fact that he should be terminated given his gross misconduct, rather than inform and consult with the Board, Nicholson took matters into his own hands and engaged outside counsel to conceal Hopkins's misconduct from the full Board and from investors.

82.    Additionally, Defendant Nicholson served as a member of Exscientia's Audit Committee of the Board of Directors. One of the purposes of the Audit Committee, according to its charter (referenced in the Company's Class Period 20-F's and Annual Report), is "providing regular reports and information to the Board with respect to material issues." Under the heading "Internal Controls and Procedures…(g) Ethical Compliance," the Audit Committee is required to "review the results of management's efforts to *monitor compliance with the Company's programs and*

*policies* adhering to applicable laws and rules, *including the Company's Code of Business Conduct and Ethics."*

83.    As stated herein, Hopkins did not adhere to the Company's purported Code of Business Conduct and Ethics, a fact that Nicholson was aware of, and which was a "material issue" given the risks associated with losing key personnel and the market's reaction to the news of Hopkins's misconduct and termination. Despite Nicholson's responsibility as an Audit Committee member to report to the Board concerning Hopkins's failure to comply with the Code of Conduct, Nicholson instead reported nothing and conspired to cover up Hopkins's misconduct and ethical violations.

84.    Additionally, Defendant Nicholson was a member of Exscientia's Remuneration Committee of the Board of Directors during the Class Period. According to the Remuneration Committee Charter (referenced in the Company's Class Period 20-F's and Annual Reports), the Committee must "*review and determine the compensation to be paid to the Company's executive officers and directors*." The Committee is required to "review, modify, and oversee the Company's overall compensation strategy and policies, including: "*reviewing, evaluating, and approving employment agreements*, severance agreements, change-of-control protections, corporate performance goals and objectives relating to the compensation*, and other compensatory arrangements of the Company's executive officers* and other senior management *and adjusting compensation, as appropriate*."

85.     With respect to "Compensation of Chief Executive Officer," the Remuneration Committee Charter provides that "the ***Committee will review and approve the compensation and other terms of employment of the Company's Chief Executive Officer and*** <u>***evaluate the Chief Executive Officer's performance***</u> ***in achieving corporate performance goals and objectives***. The ***evaluation will take into account*** the policies of the Committee and the criteria for evaluating the Chief Executive Officer's performance including: ***fostering a corporate culture that promotes*** <u>***the highest level***</u> ***of integrity and the*** <u>***highest ethical standards***</u>…"

86.     During the Class Period Hopkins's aggregate compensation consisted of his salary, a performance based annual bonus, which the Remuneration Committee determined, and performance share options. For both the 2021 and 2022 fiscal years Hopkins received performance base annual bonuses.

87.     According to Exscientia's 2021 Annual Report on Form 20-F with the SEC reporting the Company's financial and operational results for the year ended December 31, 2021 (the "2021 20-F"), which the Company filed on March 23, 2022, in 2021 Hopkins received a salary of £329,000, a bonus of £160,000, share based compensation of £3,393,000 and total compensation of £3,886,000, (the equivalent to $4,974,080).[5]  According to Exscientia's 2022 Annual Report on Form 20-F with the

---

[5]Between 2021 and 2024 the average exchange rate was $1.28 for one GBP. https://www.ofx.com/en-us/forex-news/historical-exchange-rates/yearly-average-rates/

SEC reporting the Company's financial and operational results for the year ended December 31, 2022 (the "2022 20-F"), which the Company filed on March 23, 2023, in 2022 Hopkins received a salary of £422,981, an annual bonus of £425,939, share based awards of £3,673,595, and total remuneration of £4,216,490 (the equivalent to $5,397,107).

88.    Despite Nicholson's seat on the Remuneration Committee and responsibilities to evaluate the CEO's performance with an eye to the "***highest levels of integrity and ethical standards***" and to adjust the CEO's compensation and employment terms accordingly, and despite Nicholson's knowledge that Hopkins violated the Code of Conduct, Nicholson approved Hopkins's bonuses and handsome compensation.

### ***Defendants Made False and Misleading Statements of Material Fact During the Class Period***

89.    The Class Period begins on March 23, 2022. On March 23, 2022, Exscientia filed its 2021 Annual Report on Form 20-F with the SEC reporting the Company's financial and operational results for the year ended December 31, 2021 (the "2021 20-F"). The 2021 20-F was signed by Defendant Hopkins. The 2021 20-F also contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendant Hopkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud involving management.

90.    The 2021 20-F touted the Company's Code of Business Conduct and Ethics, which "is applicable to all of our employees, officers and directors." The 2021 20-F added that the Code of Business Conduct and Ethics "is available on our website" and that "any amendment to this code, *or any waivers of its requirements,* will be disclosed on our website."

91.    The Code of Conduct found on Exscientia's website, in a Section titled "Policy Overview" stated in relevant part:

> ***This Code of Business Conduct and Ethics (this "Code") flows directly from our commitment to our mission and core values. We <u>are</u> committed to maintaining the highest standards of business conduct and ethics.*** Our combined efforts will enable us to make the right decisions that provide value and benefit our employees and shareholders as well as our shareholders, collaboration partners, and external stakeholders. ***<u>It is unacceptable</u> to cut legal or ethical corners for the benefit of EXSCIENTIA PLC ("Exscientia") <u>or for personal benefit</u>.***

> This Code is intended to deter wrongdoing as well as the appearance of wrongdoing. ***Doing the right thing is more important than winning while risking our reputation or the trust of our shareholders***, collaboration partners, and external shareholders.

> This Code is designed to ***<u>ensure</u>*** we:

>> (a) ***operate our business ethically and with integrity***;

>> (b) ***avoid actual or apparent conflicts of interest***;

>> (c) ***comply with the letter and spirit of all laws and Exscientia policies***, including full, fair, accurate, timely and understandable disclosure in reports and documents we file with the U.S. Securities and Exchange Commission (the "SEC") and in our other public communications; and

(d) ***promptly internally report suspected violations of this Code***.

92.    Significantly, Exscientia represented that the Code identified requirements, not aspirations. For example, the Code explained, in a section entitled "Compliance" that "Even if conduct complies with the letter of the law or our policies, we must avoid conduct that will have an adverse impact on the trust and confidence of our customers, partners or investors."  And in a section entitled "Honest and Ethical Conduct," the Code provided:

> ***Consistent with our core values, Exscientia personnel <u>must</u> act and perform their duties ethically, honestly and with integrity – doing the right thing even when "no one is looking.*** " This includes acting responsibly in our relationships with shareholders, collaboration partners, key opinion leaders, investigators, regulatory entities, partners, suppliers, vendors, investors and the public. We commit to only what we can do and ***we deliver on our commitments***. <u>***No winks. No nods.***</u>

93.    Exhibit A to the Code was an acknowledgment required to be signed and completed within ten business days and returned to Exscientia's Compliance Officer. The acknowledgment required that signatories attest: "I have received, read, understand and will comply with Exscientia plc's Code of Business Conduct and Ethics. I will seek guidance from and raise concerns about possible violations of this Code with my supervisor, management and Exscientia plc's Compliance Officer." Defendants Hopkins and Nicholson, by virtue of being directors and executives of Exscientia to whom the Code applies, were required to execute an acknowledgement. As such, at all times during the Class Period investors were told that Defendants

27

Hopkins and Nicholson had each certified that they understood and would comply with the Code and report and possible violations of the Code.

94.    In addition to requiring that Exscientia officers and directors not violate the Code, the Code also set forth detailed reporting requirements for all officers, directors, and employees with respect to Code violations. Specifically, the Code stated:

> If you have a concern regarding conduct that you believe to be a violation of a law, regulation, or Exscientia policy, or you are aware of questionable legal, financial, or accounting matters, or are simply unsure whether a situation violates any applicable law, regulation or Exscientia policy, please:
>
> -discuss the situation with your manager
>
> -if your manager is involved in the situation or you are uncomfortable speaking with your manager, contact our Compliance Officer; or
>
> -if you are uncomfortable speaking with the Compliance Officer because he or she works in your department or is one of your supervisors, please contact the Chief Executive Officer.
>
> A toll-free compliance hotline and email address are also available to those who wish to ask questions about Exscientia's policy…or report violations of this Code.

95.    With respect to reporting violations of the Code, the Code admonished:

"***It is important that you <u>stay vigilant to ensure there are no violations of this policy by anyone</u>. Do not stay silent in the face of a potential violation. If you have knowledge of a potential violation and fail to report it via the process set forth above<u>, you too may be subject to disciplinary action under this Code.</u>***"

96.    The Code also provided: "any amendment or waiver of any provision of

this Code must be approved in writing by the Board…***Any waiver or modification of this Code for a director, executive officer or senior financial officer will be promptly disclosed to shareholders if and as required by applicable law or the rules of any stock exchange on which any of Exscientia's equity securities are listed.***"

97.     The foregoing statements were false and materially misleading when made and failed to disclose material facts necessary to make the statements not false and misleading. Specifically:

A) Hopkins's sexual harassment and engagement in inappropriate relationships with subordinate employees made Hopkins's statement of adherence to the Code false because, in contravention of the Code, Hopkins: 1) "cut legal or ethical corners…for personal benefit", 2) did not "avoid actual or apparent conflicts of interest", 3) did not "act and perform [his] duties ethically, honestly and with integrity…" [and] "deliver on [his] commitments. No winks. No Nods"; 4) and did not "seek a waiver or modification" of the Code and "promptly disclose [it] to shareholders."

B) Nicholson's knowledge of Hopkins's relationships and violations of Exscientia's policies and his conduct in addressing the situation directly, and with the involvement of other outside counsel, rather than in consultation with the Board made Nicholson's statement of adherence to the Code false because, in contravention of the Code, Nicholson: 1) was aware of Hopkins's misconduct and Code violations but failed to "promptly internally report suspected violations of the Code", 2) did not "act and perform [his] duties ethically and with integrity"; 3) and did not "seek a waiver or modification" of the Code and "promptly disclose [it] to shareholders."

C) The statements in the Code were not reflective of the true policy in place at Exscientia because Exscientia had an unwritten policy of condoning Hopkins's ethical transgressions and predatory behavior towards female employees; and

D) The foregoing increased the risk that Exscientia would be subjected to litigation, reputational harm and the loss of key personnel.

98.     Exscientia's 2021 20-F also provided the following materially incomplete

and misleading risk disclosure regarding the loss of its executives. In discussing the risks related to the Company's employee matters, the 2021 20-F stated, in relevant:

> ***Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.***
>
> ***We are highly dependent*** on the research and development, clinical, financial, operational, scientific, software engineering and other business expertise of our executive officers, as well as the other ***principal members of our management***, scientific, clinical and software engineering teams. Although we have entered into employment agreements with our executive officers, each of them may terminate their employment with us at any time. We do not maintain "key person" insurance for any of our executives or other employees.
>
> ***The loss of the services of our executive officers or other key employees <u>could</u> impede the achievement of our development and sales goals in our software business and the achievement of our research, development and commercialisation objectives in our drug discovery business***. In either case, ***the loss of the services of our executive officers or other key employees <u>could</u> seriously harm our ability to successfully implement our business strategy***. Furthermore, replacing executive officers and key employees may be difficult and may take an extended period of time because of the limited number of individuals with the breadth of skills and experience required to successfully develop, gain regulatory approval of, and commercialise products in the life sciences industry.

99.    The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Hopkins, Exscientia's CEO, founder and most important executive, engaged in misconduct including sexual harassment and inappropriate relationships, and Nicholson, Chairman of the Board and a "key employee" participated in covering up Hopkins's misconduct in violation of Company policy, thereby actually exposing Exscientia to "the loss of services of our

executive officers of other key employees" that could harm Exscientia's business. Exscientia's boilerplate risk disclosure failed to reasonably apprise investors of the true risks of loss of key executives the Company then faced.

100.   Exscientia's 2021 20-F also provided the following materially incomplete and misleading risk disclosure regarding legal compliance matters. In discussing the risks related to the government regulation and legal compliance matters, the 2021 20-F stated, in relevant part:

> *Our employees*, independent contractors, consultants and vendors *__may engage in misconduct or other improper activities__*, including non-compliance with regulatory standards and requirements and insider trading laws, *__which could cause significant liability for us and harm our reputation.__*

101.   The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Hopkins and Nicholson, both Exscientia employees, were then engaged in "misconduct" and "improper activities" thereby actually exposing Exscientia "significant liability and harm to [its] reputation." Exscientia's boilerplate risk disclosure failed to reasonably apprise Investors of the true risks of reputational harm the Company then faced.

102.   Exscientia's 2021 20-F also provided the following materially misleading statement purporting to describe Exscientia's corporate culture. In discussing "Our Culture," the 2021 20-F stated, in relevant part:

> We believe people are our most important assets…

**

*__Diversity is an important area of focus for us__*. We are a global company, and our internationalism is reflected in our workforce which represents more than 30 nationalities from six continents. *__We will continue to work on our internal initiatives and processes to ensure that Exscientia remains and inclusive and welcoming place to work for all while working to improve our sex, racial and cultural diversity at all levels in the organisation.__*

103.    The foregoing statement depicting Exscientia as an inclusive and welcoming place to work, dedicated to diversity, was false and materially misleading because Hopkins's harassment of and inappropriate relationships with subordinate employees, and Nicholson's efforts to cover-up Hopkins's misconduct, created a toxic work environment for women, rather than an "inclusive and welcoming place" which drove female employees like FE1 away, as opposed to promoting diversity.

104.    The 2021 20-F also contained a SOX certification signed by Defendant Hopkins, attesting to the accuracy of the 20-F. Hopkins certified that the 2021 20-F "does not contain any untrue or misleading statement of a material fact." Hopkins also certified that he disclosed to the Company's auditor and audit Committee "any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

105.    These statements were false and misleading when made because they misrepresented and failed to disclose the following adverse material facts which Defendant Hopkins knew or recklessly disregarded: (1) that Hopkins violated that Company's Code of Conduct by engaging in harassment and improper relationships with subordinate employees; (2) that Nicholson violated the Company's Code of

Conduct and his responsibilities as chair or member of the Company's Board Committees to report Hopkins's violations to the Board but instead improperly obtained outside counsel to cover it up; (3) that the Company's Code of Conduct was not an accurate reflection of Exsientia's true policy given the above; (4) that his own and Defendant Nicholson's misconduct created a material risk that they would both be terminated, causing the Company to lose key talent; and (5) that his own and Defendant Nicholson's misconduct created a material risk that the Company's reputation would be harmed. Additionally, Hopkins did not disclose his or Nicholson's fraud to the Company's Audit Committee or its outside auditors.

106.   On April 22, 2022, Exscientia filed a Form 6-K with SEC announcing its distribution of a notice of annual general meeting, form of proxy and annual report to shareholders ("2021 Proxy"). The notice directed shareholders to relevant documents on Excientia's website, including its 2021 Annual Report and Financial Statements ("2021 Annual Report"). Exscientia's 2021 Annual Report contained an introductory letter signed by Defendant Hopkins. The 2021 Annual Report referenced Exscientia's Code of Conduct and Business Ethics and stated as follows with respect to the "human rights" of its employees:

> ***The Group maintains and operates pursuant to a Code of Conduct and Business Ethics, which is designed to ensure the Group operates its business ethically and with integrity and to avoid actual or apparent conflicts of interests***. The Group also maintains an Anti-Bribery Policy. The Code of Conduct and Business Ethics and AntiBribery Policy applies to all directors, officers, and employees of the Group.

\*\*\*

***We will respect the human rights of all our employees, including***:

***… ensuring employees are free from discrimination and coercion***;

The Group undertakes an annual review of its policies and procedures to establish its position with regard to compliance and best practice and ***monitor and promote a healthy corporate culture.***

107.    The foregoing statement was false and materially misleading and failed to disclose material facts necessary to make the statements not false and misleading. First, the portion of the statement concerning Excientia's Code of Conduct was false and misleading for the reasons set forth in ¶97 above. Second, Exscientia did not "respect the human rights of all employees", ensure employees were "free from discrimination and coercion," and "monitor and promote a healthy corporate culture" due to Hopkins's pattern of toxic behavior towards female employees, inappropriate relationships and harassment, and Nicholson's efforts to cover-up the same.

108.    On March 23, 2023, Exscientia filed its 2022 Annual Report on Form 20-F with the SEC reporting the Company's financial and operational results for the year ended December 31, 2022 (the "2022 20-F"). The 2022 20-F was signed by Defendant Hopkins. The 2022 20-F also contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendants Hopkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud involving management.

109.    The 2022 20-F contained statements concerning Exscientia's Code of Conduct, risk disclosures regarding the loss of its executives, risk disclosure regarding legal compliance matters, and corporate culture that are identical to the statements in Exscientia's 2021-F set forth in ¶¶90-96, 98, 100, 102, which are false and misleading for the same reasons set forth in ¶¶97, 99, 101, 103. The 2022 20-F also contained a SOX certification signed by Defendant Hopkins which is false and misleading for the reasons set forth in ¶105.

110.    On April 22, 2023, Exscientia filed a Form 6-K with SEC announcing its distribution of a notice of annual general meeting, form of proxy and annual report to shareholders ("2022 Proxy"). The notice directed shareholders to relevant documents on Excientia's website, including its 2022 Annual Report and Financial Statements ("2022 Annual Report"). Exscientia's 2022 Annual Report contained an introductory letter signed by Defendant Hopkins. The 2022 Annual Report contained the identical statements concerning Exscientia's Code of Conduct and Business Ethics and the "human rights" of its employees as those in Exscientia's 2021 Annual Report set forth in ¶106 above, which are false and materially misleading for the same reasons stated in ¶107 above.

111.    In April 2023, Exscientia published its "UK Gender Pay Gap Report" ("2022 Gender Pay Gap Report") on the Company's website. As noted herein, since 2017 the UK government has required employers with 250 or more employees to report annually on their gender pay gap. Employees are only required to report these

statistics, they are not required to provide an explanation or narrative.

112.   Exscientia's 2022 Gender Pay Gap report contained not only statistics on the gender pay gap but a lengthy and detailed narrative assuring investors of the Company's commitment to an unbiased work environment, and touted programs the Company had in place to encourage female career advancement.

113.   Exscientia's 2022 Gender Pay Gap Report began with an introduction Hopkins authored in his capacity as Exscientia's "founder, director and chief executive" which stated, in relevant part:

> ***At Exscientia we are committed to offering <u>fair, equal and unbiased</u> recruitment, promotion, and reward mechanisms and <u>an inclusive work environment</u>***. From attracting talent at Exscientia, to growing, developing, and retaining people once they have joined us. We will continue building programmes to ensure that everyone has an equal opportunity to progress. Although there is more to do, we have a number of initiatives planned and underway.

114.   Exscientia's 2022 Gender Pay Gap Report disclosed that while the gender pay gap at Exscientia was substantial (the average hourly pay gap between females and males was 22.2% and the average difference between bonus earnings was 38.5%), The Company making affirmative efforts to close the gap. Exscientia's Report highlighted "Actions We're Taking to Close the Gap," stating, in relevant part:

> Whilst we all need to recognize that there are no quick fixes to resolving our Gender Pay Gap, ***<u>we are committed</u> to building on our progress so far and to continuing <u>to foster a diverse workforce</u> both within and beyond Exscientia. There <u>are several actions we have been taking</u> as a business and we will continue to focus on them to help improve the diversity of our workforce*** which will impact factors such as our gender pay gap.

115.  The purported "actions" enumerated include:

-When hiring we always strive to have a diverse selection of candidates across all vacancies. Since 2020 we have seen an improving gender ratio across the organization.

-As part of our new people strategy, ***we aim to ensure at least 50% of all vacant Executive Director and above roles are filled by women***

-The Talent team currently volunteers with Stemettes. ***A non-profit organization supporting girls, young women, and non-binary people into stem subjects or careers.***

116.  In concluding its 2022 Gender Pay Gap Report, Exscientia confirmed its

commitment to supporting and advancing the careers of women in STEM:

Looking Ahead…***We need to play our part in encouraging girls to consider STEM*** (Science, Technology, Engineering, Mathematics) careers. Inspiring young women to work in STEM in our community will build a female talent pipeline for the long term.  It's going to take some time for Exscientia and our peers to improve senior female representation. ***Bringing these issues to life through initiatives like UK gender pay gap reporting is important for making sure we continue to progress in the right direction***.

117.  The foregoing statements were false and misleading. Specifically,

Exscientia was not committed to offering a "fair, equal, and unbiased reward

mechanisms" and an "inclusive work environment" because Hopkins's predatory

conduct towards women created a hostile work environment for women, which

Nicholson actively furthered by covering up Hopkins's misconduct. Further, any

actions Exscientia's purportedly undertook to ensure executive roles were "filled by

women" or "build a female talent pipeline" by "encouraging girls to consider STEM"

were nullified by Hopkins's misconduct, which created a hostile work environment for women at Exscientia.

***False and Misleading Statements in Exscientia's Board of Director Committee Charters***

118.    Exscientia's Class Period 20-F's referenced and directed investors to the written charters for each of its board of director committees as well as listed the responsibilities of each of the committees. Exscientia's 2021 and 2022 20-F's stated, under the heading "Committees of our Board of Directors": "Our board of directors has three standing committees: an audit committee, a remuneration committee and a nominations and corporate governance committee. The board has adopted a written charter for each of the committees that is available to securityholders on our website…"

119.    Throughout the Class Period Nicholson served as Chair of Exscientia's Nominating and Corporate Governance Committee. The Charter of the Nominating and Corporate Governance Committee, states that its purpose is to: "oversee the Company's corporate governance function", "identify, evaluate, recommend, and communicate with candidates qualified to become board members… and "***make other recommendations to the Board relating to the directors of the Company.***" The Charter further states that Nominating and Corporate Governance Committee is authorized to "***communicate with the Board.***" Further, "[i]f the Committee concludes it must retain legal, accounting, or other outside advisors [it

should] do so and determine compensation for those advisors at the Company's expense."

120.    Additionally, the Corporate Governance Committee Charter states the committee must: "identify and ***evaluate candidates, including nomination of incumbent directors for re-election of nominees….to serve on the board***" using criteria including "***potential conflicts of interest***, director independence and ***other requirements,***" "***periodically review the performance of the Board,***" and consider "***whether the directors, both individually and collectively, can and do provide integrity, experience, judgment***, commitment, skills, diversity and expertise ***appropriate for the Company***."

121.    With respect to "Environmental, Social and Corporate Governance (ESG) Matters," the Corporate Governance Committee charter states the committee must "***Oversee and periodically review*** ESG matters relevant to the Company business and operations, including policies and practices concerning (i) ***corporate social responsibility***…[and] ***employee diversity***."

122.    The foregoing statements in Exscientia's Nominating and Corporate Governance Committee Charter were false and misleading when made because Defendants knew or recklessly disregarded that, in contravention of his responsibilities as Committee Chair Nicholson failed to: (1) "make recommendations to the Board" that Hopkins be terminated;  (2) "communicate with the Board" concerning Hopkins's behavior; (3) determine that Hopkins should not be "re-elected…to serve on the

Board" because of his misconduct; (4) determine that Hopkins, as an "individual director" did not provide the required "integrity" and "judgment" "appropriate for the company"; and (5) "oversee" "corporate social responsibility" and "diversity" because he allowed Hopkins to continue to behave in a socially and ethically irresponsible manner which perpetuated lack of gender diversity because it essentially forced female employees like FE1 who were victims of Hopkins's harassment to leave Exscientia. Additionally, while Nicholson decided to "retain legal advice" concerning Hopkins's misconduct he did so to conceal it, and without consulting the other members of the Nomination and Corporate Governance Committee. Accordingly, the statements in the Charter were not a true representation of how the Committee in fact functioned.

123.    Additionally, Defendant Nicholson served as a member of Exscientia's Audit Committee of the Board of Directors. Exscientia's Audit Committee charter states that one of the purposes of the Audit Committee is "providing regular reports and information to the Board with respect to material issues." Under the heading "Internal Controls and Procedures…(g) Ethical Compliance," the Audit Committee is required to "review the results of management's efforts to ***monitor compliance with the Company's programs and policies*** adhering to applicable laws and rules, ***including the Company's Code of Business Conduct and Ethics.***"

124.    The foregoing statements in Exscientia's Audit Committee Charter were false and misleading when made because Defendants knew or recklessly disregarded that: (1) Hopkins did not adhere to the Company's purported Code of Business

Conduct and Ethics, which was a "material issue," and Nicholson failed to report this to the Board but instead conspired to cover up Hopkins's misconduct and ethical violations. Accordingly, the statements in the Charter were not a true representation of how the Committee in fact functioned.

125.  Additionally, Defendant Nicholson was a member of Exscientia's Remuneration Committee of the Board of Directors during the Class Period. The Remuneration Committee Charter states, in relevant part, that the Committee must: "*review and determine the compensation to be paid to the Company's executive officers and directors*"; "review, modify, and oversee the Company's overall compensation strategy and policies, including: "*reviewing, evaluating, and approving employment agreements*, severance agreements, change-of-control protections, corporate performance goals and objectives relating to the compensation*, and other compensatory arrangements of the Company's executive officers* and other senior management *and adjusting compensation, as appropriate*."

126.  With respect to "Compensation of Chief Executive Officer," the Remuneration Committee Charter provides that "the *Committee will review and approve the compensation and other terms of employment of the Company's Chief Executive Officer and* <u>*evaluate the Chief Executive Officer's performance*</u> *in achieving corporate performance goals and objectives*. *The evaluation will take into account* the policies of the Committee and the criteria for evaluating the Chief Executive Officer's performance including: *fostering a corporate culture that*

41

*promotes <u>the highest level</u> of integrity and the <u>highest ethical standards</u>*…"

127.   The foregoing statements in Exscientia's Remuneration Committee Charter were false and misleading when made because Defendants knew or recklessly disregarded that: Defendant Nicholson, as a member of the Remuneration Committee (1) failed to evaluate the CEO's performance with an eye to the "***highest levels of integrity and ethical standards***" and to adjust the CEO's compensation and employment terms accordingly and (2) approved Hopkins's bonuses and handsome compensation despite Hopkins's violations of the Company's Code of Conduct. Accordingly, the statements in the Charter were not a true representation of how the Committee in fact functioned.

***Defendants Announce Hopkins's Termination and Nicholson's Cover-Up and Resignation, Exposing Defendants' Prior Misstatements: Loss Causation***

128.   On February 13, 2024, Exscientia filed a report on Form 6-K with the SEC and issued a press release announcing that Exscientia's Board of Directors had decided to terminate the employment of Hopkins as CEO and remove him from his role as Executive Director of the Board "in each case for cause and effective immediately." Exscientia's press release stated that the Board decided to terminate Hopkins after an investigation which found that Hopkins "had engaged in relationships with two employees that the Board determined were inappropriate and inconsistent with the Company's standards and values."

129.   Exscientia's February 13, 2024 Press Release further revealed that during

its investigation into Hopkins's misconduct it discovered that Defendant Nicholson had "prior knowledge of the existence of the earlier of Dr. Hopkins' relationships and had addressed the situation directly, and with the involvement of other outside counsel, rather than in consultation with the Board." After "discussions with the Board" Nicholson resigned.

130.   On this news, Exscientia's stock price fell $1.72 per share, or 22.9%, to close at $5.79 per share on February 13, 2024, damaging investors. This decline represented the largest single-day decline Exscientia stock experienced in the Company's history, with trading volume of over seven times the volume two days prior.

131.   While Exscientia's February 13 press release disclosed that the Company terminated Hopkins for cause, the Company mischaracterized the nature of Hopkins's conduct as him having engaged in "relationships." As FE1 stated, the conduct at issue with respect to FE1 was not a "relationship." Instead, it consisted of Hopkins's unilateral and unwanted inappropriate behavior which traumatized and intimidated FE1 so much that she left the Company and the entire biotech industry to escape Hopkins.

132.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

***

133.    While Exscientia represented in the press release announcing Hopkins's termination that his misconduct "did not impact the Company's consolidated financial statements or its internal control over financial reporting" the impact on Exscientia of having lost Hopkins, one of the Company's most valuable assets, was apparent.

134.    In May 2024, Exscientia let go of 25% of its employees as part of "efficiency measures" to save cash and preserve its AI pipeline. Then, in August 2024 Exscientia announced that it would merge into a company called Recursion Pharmaceuticals. At the end of the proposed transaction Recursion shareholders would own 74% of the combined company and Exscientia shareholders would own 26% of the combined company.

## ADDITIONAL SCIENTER ALLEGATIONS

135.    As alleged herein, Defendants acted with scienter in that they knew and/or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Exscientia, their control over, and/or receipt of Exscientia's materially misleading statements and/or their associations with the Company, participated in the fraudulent scheme alleged herein. Hopkins was

principally involved in the misconduct alleged herein, and Nicholson concealed Hopkins's misconduct, as revealed for the first time in the Company's February 13, 2024 Press Release.

136.    Defendant Hopkins served as Exscientia's CEO, and Defendant Nicholson served as the Company's Chairman of the Board. Given their high-level positions at Exscientia, participation in and awareness of Exscientia's day-to-day operations, and control over the issuance of the false and misleading statements alleged herein, the knowledge of deliberate recklessness of Hopkins and Nicholson concerning their materially false and misleading statements is imputed to Exscientia under the principles of corporate scienter.

137.    Exscientia has admitted that it ousted its CEO and Chairman of the Board and admitted that Hopkins's conduct violated the Company's stated policies. Hopkins was principally involved in the misconduct with Nicholson being principally involved in concealing Hopkins's misconduct, as revealed for the first time in Exscientia's February 13, 2024 Press Release.

138.    Given that Defendants Hopkins and Nicholson certified their compliance with the Company's Code of Conduct, which detailed the Company's policy against conflicts of interest and mandated honesty and ethical conduct and detailed the process for reporting unethical behavior and violations of the Code of Conduct, they were aware that their actions were in violation of the Code.

139.    Defendant Nicholson's position as Chair and member of the Company's

various Board Committees made him acutely aware of the steps he was required to take in learning of Hopkins's misconduct. Nicholson's roles on these various committees supports a strong inference of scienter.

140.   Defendant Hopkins was personally charged with certifying, under SOX, that the Company's 20-F's were free from any material misstatements and that any fraud involving management, whether or not material, had been disclosed the Audit Committee and the Company's outside auditors. Hopkins's false SOX certifications support a strong inference of scienter.

141.   Defendant Hopkins was aware that pursuant to his Employment Agreement his actions constituted grounds for termination with cause, and that he would accordingly forfeit his bonus and annual share-based compensation. Following the board's discovery of Hopkins's misconduct, Hopkins forfeited significant compensation. In February 2024 Hopkins forfeited all share-based awards made to him in 2023, which totaled £4,093,411 ($5,239,566). The Board's findings concerning Hopkins's behavior and Hopkins's foregone compensation create a strong inference of scienter.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

142.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from

the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

143.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Investors at this time and can be ascertained only through appropriate discovery, Investors believe that there are hundreds, if not thousands of members in the proposed Class.

144.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

145.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Investors have no interests antagonistic to or in conflict with those of the Class.

146.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

147. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

148. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

149.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

150.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**NO SAFE HARBOR**

151.    The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

152.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Exscientia who knew that the statement was false when made.

## COUNT I
### *For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants*

153.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

154.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

155.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Investors and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

157.  Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or

documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

158.    Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Investors and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Investors and the Class.

159.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Investors and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

160.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

161.    As a result of the wrongful conduct alleged herein, Investors and other members of the Class have suffered damages in an amount to be established at trial.

162.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Investors and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II
*Violations of Section 20(a) of the Exchange Act*
<u>*Against the Individual Defendants*</u>

163.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

165.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

166.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

167.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the

Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: November 11, 2024              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Fax: (973) 833-0399
lrosen@rosenlegal.com

Sara Fuks (*Pro Hac Vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
sfuks@rosenlegal.com

*Lead Counsel for Plaintiffs*

# EXHIBIT A

## Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Exscientia p.l.c The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis not to exceed one-third of the recovery and will advance all costs and expenses. All payments of fees and expenses shall be made only after Court review and approval. The Exscientia p.l.c Retention Agreement provided to the Plaintiff is incorporated by reference herein and is effective, upon execution and delivery by The Rosen Law Firm P.A.

**First Name:**         Robert
**Middle Initial:**      A
**Last Name:**          Sullivan
**Mailing Address:**    ███████████
**City:**               ██████
**State:**              ███████
**Zip Code:**           █████
**Country:**            USA
**Phone:**              ████████
**Email Address:**      ██████████████

Plaintiff certifies that:

1. Plaintiff has reviewed a complaint and authorized its filing or the filing of an amended complaint.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Purchases:**

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 6/8/22 | 30 | 15 |

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2/2/23 | 60 | 7.40 |

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 2/15/24 | 10 | 6.35 |

**Sales:**

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|

Common Stock

**I have not sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, except if set forth below.**
Not applicable

I declare and certify under penalty of perjury, under the laws of the United States of America, that the foregoing information is true and correct.   **YES**

By Signing below and submitting this certification form electronically, I intend to sign and execute this certification pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis.   **YES**

Date of signing: 05/16/2024 02:40:03 at Eastern Standard Time, USA

_____