## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In Re Exscientia p.l.c. Securities Litigation<br><br>This Document Relates To: All Actions | Master File No.  1:24-cv-05692-RMB-AMD<br><br>CLASS ACTION<br><br>Motion Day: May 19, 2025<br>Judge: Hon. Renée Marie Bumb<br>Courtroom 3D |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Sara Fuks (*Pro Hac Vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: sfuks@rosenlegal.com

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND ................................................................................3

High-Profile CEO Terminations, the MeToo Movement, and UK Laws Define the Landscape Surrounding Sexual Misconduct in the Workplace ........................3

Hopkins Engaged in Systematic Sexual Harassment, Inappropriate Relationships and Intimidation with Nicholson's Knowledge and Acquiescence ........................4

With Knowledge of Their Own Misconduct Defendants Issue Related Materially Misleading Statements ........................................................................................6

Exscientia Reveals Hopkins's Termination and Nicholson's Resignation ...........10

III. ARGUMENT ......................................................................................................10

A.  Standard of Review...................................................................................10

B.  The AC Adequately Alleges Material Falsity .................................................11

1.   Defendants' Code of Conduct Statements Are Actionable ........................12

2.   The Corporate Culture and Gender Pay Gap Statements Are Actionable..21

3.   Defendants' Risk Disclosure Statements Are Actionable ..........................24

4.   Statements in Exscientia's Board Committee Charters Are Actionable ........ ..................................................................................................................27

5.   Hopkins's SOX Certifications Are Actionable...........................................30

C.  The AC Adequately Alleges Scienter...........................................................31

1.   The AC Adequately Alleges Defendants' Conscious Disregard and/or Recklessness...............................................................................................32

i

2.    The Nature of the Misconduct Supports an Inference of Scienter..............34

3.    Exscientia's Admission, Hopkins's Termination, and Nicholson's Resignation Support Scienter....................................................................35

4.    Defendants Do Not Allege a Competing Inference Against Scienter ........35

D.    The AC Adequately Alleges Loss Causation ................................................38

IV.    CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Emp'ees' Ret. Sys. v. Energy Transfer LP*,
532 F.Supp. 3d 189 (E.D. Pa. 2021).................................................... 12, 14, 19, 32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................10

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,*
394 F.3d 126 (3d Cir. 2004) ....................................................................11

*City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
683 F. Supp. 3d 120 (D. Mass. 2023)............................................... 18, 36

*City of Roseville Emps' Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009).........................................................19

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) ............................................... 14, 19

*Craig v. Target Corp.*,
2024 WL 4979234 (M.D. Fla. Dec. 4, 2024) ......................................28

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. 2018) ..............................................................33

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................38

iii

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
  2021 WL 1890490 (S.D. Ohio May 11, 2021)......................................................29

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................40

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ........................................................................ 33, 35

*Guo v. Mahaffy*,
  2020 WL 5798531 (D. Colo. Sept. 29, 2020)....................................................30

*Holwill v. AbbVie, Inc.*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020).......................................................15

*Howard v. Arconic*,
  2021 WL 2561895 (W.D. Pa. June 23, 2021) ............................................... 24, 36

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
  903 F.2d 186 (3d Cir. 1990) ..............................................................................16

*Hutton v. McDaniel*,
  264 F.Supp.3d 996 (D. Ariz. 2017) ...................................................................30

*Ieradi v. Mylan Labs., Inc.*,
  230 F.3d 594 (3d Cir. 2000) ...........................................................................3, 23

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ..............................................................................31

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ..............................................................................24

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) ..........................................................15

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ...............................................................24

*In re Amarin Corp. PLC Sec. Litig.*,
2022 WL 2128560 (3d Cir. June 14, 2022)................................................... 25, 26

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) ........................................................ 14, 18

*In re Bradley Pharm., Inc. Sec. Litig.*,
421 F.Supp.2d 822 (D.N.J.2006)........................................................................39

*In re Bristol–Myers Squibb Sec. Litig.*,
2005 WL 2007004 (D.N.J. August 17, 2005) .....................................................39

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ....................................................................... 32, 37

*In re CenturyLink Sales Practices and Sec. Litig.*,
403 F. Supp. 3d 712 (D. Minn. 2019)..................................................................15

*In re Cognizant Tech Solutions Corp. Sec. Litig.*,
2018 WL 3772675 (D.N.J. Aug. 8, 2018) ...........................................................19

*In re DVI Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. 2010) .....................................................................40

*In re Electrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017) .................................................................15

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ....................................................................34

*In re Heckmann Corp. Sec. Litig.*,
869 F. Supp. 2d 519 (D. Del. 2012).....................................................................35

*In re Honeywell Intern., Inc. Securities Litig.*,
182 F.Supp.2d 414 (D.N.J. 2002)........................................................................38

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) ............................................................ 15, 17

*In re Novastar Fin. Sec. Litig.*,
2005 WL 1279033 (W.D. Mo. May 12, 2005)......................................................34

*In re Par Pharm. Sec. Litig.*,
2009 WL 3234273 (D.N.J. Sept. 30, 2009)........................................................35

*In re Petrobras Sec. Litig.*,
116 F.Supp. 3d 368 (S.D.N.Y. 2015) ................................................................23

*In re Signet Jewelers Ltd. Sec. Litig.,*
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)................................. 12, 14, 33, 36

*In re Signet Jewelers Ltd. Sec. Litig.,*
389 F. Supp. 3d 221 (S.D.N.Y. 2019) ...............................................................16

*In re Tenaris S.A. Sec. Litig.*,
493 F.Supp.3d 143 (S.D.N.Y. 2020) ............................................................ 18, 27

*In re Urb. Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015)................................................................36

*In re ViroPharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014)..................................................................22

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ............................................................ 20, 21, 31, 36

*Kline v. First W. Gov't Sec., Inc.*,
24 F.3d 480 (3d Cir. 1994) ...............................................................................27

*Kooker ex rel. Hecla Mining Co. v. Baker*,
497 F.Supp.3d 1 (D. Del. 2020)........................................................................30

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .......................................................... 17, 23

*Local 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ..........................................................................19

*Lopez v. CTPartners Exec. Search*,
  173 F. Supp.3d 12 (S.D.N.Y. 2016) ...................................................................23

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...........................................................................25

*McCabe v. Ernst & Young, LLP.*,
  494 F.3d 418 (3d Cir. 2007) ............................................................................38

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ............................................................................25

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) ............................................................................38

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................................34

*Nykredit Portefolje Admin. A/S v. ProPetro Holding Corp.*,
  2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) ..................................... 15, 17, 18

*Okla. L. Enf't. Ret. Sys. v. Papa John's Int'l*,
  444 F.Supp.3d 550 (S.D.N.Y. 2020) ................................................................24

*Omnicare, Inc. v. Laborers District Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)....................................................................................22

*Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*,
  294 A.3d 65 (Del. Ch. 2023) ...........................................................................29

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ............................................................................11

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021)...................................................................37

*Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
  2016 WL 466958 (M.D. Pa. Feb. 8, 2016).........................................................35

vii

*SEC v. Desai*,
  145 F. Supp. 3d 329 (D.N.J. 2015) ..........................................................................34

*SEC v. Falstaff Brewing Corp.*,
  629 F.2d 62 (D.C. Cir. 1980) ..................................................................................29

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ...................................................................................25

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ...................................................................................11

*Steamfitters Local 449 Pension Fund v. Alter*,
  2011 WL 4528385 (E.D. Pa. Sep. 30, 2011) ..........................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................... 10, 31, 32

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018)................................................. 18, 20, 31

*Vanderhoef v. China Auto Logistics Inc.*,
  2020 WL 5105243 (D.N.J. 2020) ...........................................................................3, 39

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ...................................................................................25

## Rules

Fed. R. Civ. P. 15(a)(2)....................................................................................................40

Lead Plaintiff Frank Campanile and named Plaintiff Robert Sullivan ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint ("AC" or "Complaint").[1]

## I.      INTRODUCTION

Throughout the Class Period, in the 20-F's Hopkins signed and elsewhere, Defendants touted Exscientia's Code of Business Conduct and Ethics ("Code"), strong corporate culture of respect and freedom from coercion, and progressive stance towards furthering the careers of women in STEM. And against the backdrop of a post MeToo world, increasingly stringent UK laws on sexual harassment at work, and investors' zero tolerance policy for CEO affairs with subordinates, Defendants warned of the possibility of harm to Exscientia's business in the event the Company could not retain Hopkins's services, if, hypothetically, he was to engage in misconduct. Further, investors could be confident, given the written charters of Exscientia's Board committees- each of which Nicholson was a member or chair- that all Excientia executives and board members were free of conflicts of interest and complied with the Exscientia's Code. Little did investors know that under these false assurances Hopkins promoted a culture of intimidation and harassment, which Nicholson knew about and enabled, in which Hopkins harassed

---

[1] "¶" refers to paragraphs in the AC. Capitalized terms not defined herein have the same meaning as in the AC. Unless otherwise noted, all emphasis is added, and all internal citations, quotation marks, and alterations are omitted.

1

and traumatized his assistant and at least one other female Exscientia employee, carried on an affair with yet another, and overall displayed a "pattern of toxic behavior" towards women, resulting in a hostile and unlawful work environment that was directly at odds with Defendants' public statements.

A year and a half after Nicholson learned of Hopkins's misconduct (in response to which he "did nothing" and hired his own lawyers to help cover it up) investors began to learn the truth about Exscientia's superstar CEO. In February 2024, Exscientia announced Hopkins had been terminated for cause due to "inappropriate relationships," which Nicholson- who Exscientia announced would resign- knew about, causing Excientia's stock price to plummet 23% in one day.

Unable to meaningfully contest the misconduct underlying this case, Defendants assert that this Court must conclude, as a matter of law, that they face no liability for misleading investors about this malfeasance. Defendants' arguments ignore and contradict the AC's well-pled allegations, misstate the law, and, at best, raise disputed issued of fact. They should be rejected.

As to falsity, the main thrust of Defendants' Motion to Dismiss ("MTD") is that "the securities laws police fraud, not HR complaints" and that all of Defendants' alleged misstatements are simply too "generic" for any reasonable investor to rely on. This argument ignores that the AC alleges that Defendants made specific statements that were materially false and misleading or otherwise created a duty to

2

speak more fully and truthfully. The assertion that Defendants' statements are "generic", *i.e.*, immaterial, is not an issue that can be decided on the pleadings.[2] As to scienter, Defendants fail to meaningfully address the AC's allegations of actual knowledge and recklessness, bootstrapping their scienter argument with points that go to materiality. As to Defendants' loss causation argument, it misstates the standard for pleading loss causation by arguing that a corrective disclosure must perfectly mirror the earlier misstatement. This is not the law.[3]

In sum, the AC states a claim for securities fraud. Accordingly, Defendants' MTD should be denied in its entirety and this case should proceed to discovery.

## II.   FACTUAL BACKGROUND

Defendant Hopkins founded Exscientia, a UK biotechnology company, out of his academic lab in 2012 and transformed it into a publicly traded company valued at $2.9 billion. ¶¶2-4, 34-35. Exscientia's commercial success was entirely owing to Hopkins, its "high impact celebrity CEO" and executive director, named by Time as one of the most influential people in AI. ¶¶5, 34-46.

**High-Profile CEO Terminations, the MeToo Movement, and UK Laws Define the Landscape Surrounding Sexual Misconduct in the Workplace**

The MeToo Movement, which crystallized in 2017, created a new reality where sexual harassment and inappropriate workplace relationships between executives

---

[2] *See, e.g., Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir. 2000).
[3] *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. 2020)

3

and their subordinates were no longer tolerated by investors or the public. ¶¶47-54. In the wake of the MeToo Movement, in 2017 the UK government mandated employers report their gender pay gap. ¶55. By 2019 the UK government had created a new statutory code of practice addressing sexual harassment in the workplace. ¶48. Prior to and during the Class Period several high-profile CEOs were terminated for having "relationships" with employees, in part because such relationships could "blur the confines of consent" and constitute an abuse of power. ¶¶49-53. Relationships between executives and subordinates pose potential conflicts of interest and reputational and financial risk, especially post-MeToo. ¶54.

**Hopkins Engaged in Systematic Sexual Harassment, Inappropriate Relationships, and Intimidation with Nicholson's Knowledge and Acquiescence**

Defendant Hopkins's former strategic assistant ("FE1") reported directly to Hopkins and served as his strategic assistant from November 2021 through December 2022. ¶58. FE1 left Exscientia in December 2022 because of Hopkins's misconduct towards her. ¶62. She felt she had "no choice but to leave" Exscientia and "moved hundreds of miles away," specifically to escape Hopkins. *Id.* She even left the biotech industry altogether. *Id.*

FE1 stated that while Exscientia publicly characterized Hopkins's misconduct towards her as an "inappropriate" "relationship," what transpired between the two was not a "relationship." ¶59. Instead FE1 stated, it was not consensual, and while FE1 did not go into graphic detail, she described Hopkins as "behaving

4

inappropriately" towards her to such a degree that Hopkins's conduct traumatized her. FE1 stated that she was "scared" of Hopkins, alluding to his ability to manipulate the situation and intimidate her, describing him as a "very clever man." ¶¶59, 64. FE1 stated that Hopkins displayed a "pattern of toxic behavior towards women" at Exscientia. ¶63. FE1 knew at least one other female employee at Exscientia that was a victim of Hopkins's misconduct. *Id.* Hopkins's misconduct towards women was so prominent that FE1 was concerned about potential victims at the new company Hopkins started called Xyme. ¶67. In addition, FE1 stated that Hopkins had an undisclosed relationship with the woman who worked as Hopkins's Executive Assistant from 2017 through 2021 and continued working at Exscientia through 2023. ¶65. FE1 described this woman as having an unwavering allegiance towards Hopkins, stating that she would likely "lie under oath to protect" Hopkins. ¶66.

In August 2022 FE1 decided to report Hopkins's inappropriate behavior to Defendant Nicholson directly. ¶60. Defendant Nicholson was Exscientia's Chairman of the Board during the Class Period. ¶30. Nicholson was also Chair of Exscientia's Nominating and Corporate Governance Committee and a member of Exscientia's Audit Committee and Remuneration Committee. *Id.* Nicholson's roles on these various committees required him to evaluate the CEO's performance with respect to whether his "integrity," "experience," and "judgment" was appropriate for the Company, and whether he "foster[s] a corporate culture that promotes the highest

level of integrity and the highest ethical standards"; evaluate potential conflicts of interest; oversee and review policies concerning corporate social responsibility; and review the results of management's efforts to monitor compliance with the Company's Code of Business Conduct and Ethics. ¶¶70-88. Nicholson was therefore ideally suited (and duty-bound) to put a stop to Hopkins's misconduct. Indeed, Hopkins's employment agreement stated that Exscientia could terminate him for cause immediately if he engaged in "gross misconduct" or behavior that brings him or Exscientia into disrepute or that is materially prejudicial to the Company's interests. ¶¶79-80. As Chair of the Nominating and Corporate Governance Committee, having learned of Hopkins's misconduct from FE1, Nicholson was required to recommend to Exscientia's Board that Hopkins be terminated. ¶81.

However, FE1 stated that when she reported Hopkins to Nicholson, he "did nothing at all." ¶60. In truth, unbeknownst to FE1 and as investors later would learn, Nicholson concealed Hopkins's misconduct by engaging outside counsel to deal with the situation. ¶¶61, 81. Remarkably, FE1 also learned from an Exscientia employee that Hopkins's own wife- who worked at Exscientia since 2016- had reported Hopkins's misconduct to Exscientia's Board of Directors. ¶61.

**With Knowledge of Their Own Misconduct Defendants Issue Related Materially Misleading Statements**

Defendants' Class Period 20-F's, which Hopkins signed, referred investors to Exscientia's Code of Business Conduct and Ethics, posted on Exscientia's website.

¶¶89-90. Defendants represented the Code "applies to all employees, officers and directors" and "flows directly from our commitment to our mission and core values." ¶¶90-91. The Code used present-tense, mandatory language: "We **_are_** committed to maintaining the highest standards of business conduct and ethics…It **_is unacceptable_** to cut legal or ethical corners for the benefit of [Exscientia] **_or for personal benefit_**." Defendants purportedly designed the Code to: "**_ensure_**," we "**_avoid actual or apparent conflicts of interest_**", "comply with the letter and spirit of all laws and Exscientia policies", and "**_promptly internally report suspected violations of this Code._**" ¶¶91-92. The Code set forth requirements, not aspirations, warning that even if technically legal or not violative of any specific Exscientia policy, "we **_must_** avoid conduct that will have an adverse impact on the trust and confidence of our customers, partners or investors." Further, Exscientia personnel "**_must act and perform their duties ethically, honestly and with integrity – doing the right thing even when 'no one is looking.'_**" **_This includes acting responsibly in our relationships_**… We commit to only what we can do and **_we deliver on our commitments_**. **_No winks. No nods._** _Id_. The Individual Defendants were required to, and did, sign an acknowledgement attesting that they "received, read, understand, and will comply" with the Code and "raise concerns about possible violations of this Code" to management/compliance. ¶93. The Code also contained detailed reporting requirements and warned: "**_stay vigilant to ensure there are no violations of this_**

7

***policy <u>by anyone</u>. If you have knowledge of a potential violation <u>and fail to report</u>***

***<u>it via the process set forth above</u>, <u>you too may be subject to disciplinary action</u>***

***<u>under this Code.</u>*** ¶¶94-95. Defendants represented that if anyone received a waiver

or modification of any Code provision Exscientia would disclose it to investors. ¶96.

Additionally, Defendants made positive statements about Exscientia's corporate

culture in its Class Period 20-F's, stating "diversity is an important area of focus for

us," and representing that Exscientia is "an inclusive and welcoming place for

all"…We will continue to work on our internal initiatives "to improve our sex, racial

and cultural diversity at all levels in the organisation." ¶¶102, 109. Exscientia's

Proxies incorporated its Annual Reports, began with a letter Hopkins signed, stating

that Exscientia "maintains and operates pursuant to [the Code], ***which is designed***

***to <u>ensure</u> the Group operates its business <u>ethically and with integrity and to avoid</u>***

***<u>actual or apparent conflicts of interest</u>***. Hopkins's letter promised "***We will respect***

***the <u>human rights</u> of all our employees, including…ensuring employees are free***

***from discrimination <u>and coercion</u>***." ¶¶106, 110.

Relatedly, Exscientia went beyond its gender pay gap reporting requirements and

published a report touting its progressive policies to "***play our part in encouraging***

***girls to consider STEM***" and "***build a female talent pipeline for the long term***."

¶¶111-116. Hopkins's authored the Report's introduction stating "At Exscientia we

are committed to offering fair, equal ***<u>and unbiased</u> recruitment, promotion, and***

*reward mechanisms and <u>an inclusive work environment</u>*. ¶113. The Report detailed several actions Exscientia had taken such as "aiming to ensure at least 50% of all vacant Executive Director and above roles are filled by women." ¶115.

Exscientia's 20-F's contained risk disclosures stating that its "*future success depends on our ability to retain key executives*," and warned "*the loss of services of our executive officers or other key employees*, "*<u>could impede the achievement</u>*" of "sales goals," and "commercialisation objectives" and "*<u>could seriously harm our ability to successfully implement our business strategy</u>*." ¶¶98, 100, 109.

Exscientia's 20-F's directed investors to the written charters of its Board committees and listed the responsibilities of each. ¶118. The Nominating and Corporate Governance Committee, chaired by Nicholson, "make[s] recommendations to the Board relating to directors" and *<u>must</u>* evaluate directors' "*<u>potential conflicts of interest</u>*," *determine whether directors "<u>can and do provide integrity, experience [and] judgment…appropriate for the Company</u>*" and oversee "*corporate social responsibility and employee diversity*." ¶¶119-21. The Audit Committee charter represented that it is *<u>required to</u>* review management's efforts to "*monitor compliance with*" legal and other policies "*including the Company's [Code]."* ¶123. The Remuneration Committee *<u>must</u>* "evaluate the CEO's performance" and whether he "*foster[s] a corporate culture that promotes the highest level of integrity and the highest ethical standards*." ¶¶125-26.

9

**Exscientia Reveals Hopkins's Termination and Nicholson's Resignation**

On February 13, 2024, Exscientia issued a press release announcing the Board had decided to terminate Hopkins as CEO and remove him as Executive Director of the Board "in each case for cause and effective immediately." ¶128. Exscientia revealed that a Board investigation found that Hopkins "had engaged in relationships with two employees" that "were inappropriate and inconsistent with the Company's standards and values." *Id.* Exscientia further revealed that Nicholson had "prior knowledge of the existence of the earlier of Dr. Hopkins' relationships and had addressed the situation directly, and with the involvement of other outside counsel, rather than in consultation with the Board." ¶129. After "discussions with the Board" Nicholson resigned. *Id.* On this news, Exscientia's stock price fell 22.9% ($1.72/share) to close at $5.79 on February 13, 2024, damaging investors. ¶130. This was the largest single day decline in Company history. *Id.*

## III.    ARGUMENT

### A.    Standard of Review

In evaluating a motion to dismiss, a court must construe the complaint liberally, "accept[ing] all factual allegations in the complaint as true" and construing them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

10

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    The AC Adequately Alleges Material Falsity

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). A misstatement or omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As the Third Circuit has held, "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992). Thus, "[o]nly if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that ***reasonable minds cannot differ*** on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* Additionally, "once a company has chosen to speak on an issue- even an issue it had no independent obligation to address- it cannot omit material facts related to that issue so as to make its disclosure misleading." *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).

11

### 1.   *Defendants' Code of Conduct Statements Are Actionable*

Courts find statements contained in a codes of conduct actionable where they are either: 1) "directly at odds with the conduct alleged in the complaint,"[4] 2) "address concrete steps a company is taking" [to enforce the code], since a reasonable investor might rely upon these statements as a guarantee that such steps had in fact been implemented,"[5] or 3)  the statements in the code do not reflect the true policy in place at the company.[6] Exscientia's Code statements are actionable on all these grounds.

Throughout the Class Period Exscientia's 20-F's referred investors to its Code, which was purportedly derived from Exscientia's "mission and core values" of "maintaining the highest standards of business conduct and ethics." ¶91. Hopkins and Nicholson signed attestations pledging compliance with the Code, promising to immediately raise concerns about any potential Code violation. ¶93. The Code used mandatory language. Exscientia's directors and officers "***must*** act and perform their duties ethically, honestly, and with integrity- doing the right thing even when no one is looking…No winks. No nods." ¶¶91-92 Specifically, the Code prohibited "cut[ting] legal or ethical corners for the benefit of Exscientia [ ] or for personal

---

[4] *In re Signet Jewelers Ltd. Sec. Litig.* 2018 WL 6167889 at *17 (S.D.N.Y. Nov. 26, 2018).
[5] *Allegheny Cnty. Emp'ees' Ret. Sys. v. Energy Transfer LP*, 532 F.Supp. 3d 189, 221 (E.D. Pa. 2021).
[6] *Id.*  at 224.

12

benefit," required "avoid[ing] actual or apparent conflicts of interest", "compl[iance] with the letter and spirit of all laws and Exscientia policies," "acting responsibly in our relationships…" and "promptly internally report[ing] suspected violations of this Code." *Id*. Additionally, the Code set forth detailed reporting requirements for potential Code violations (¶¶94-95) and represented that any amendments or waivers to any Code provision would be disclosed to investors. ¶96.

First, regardless of whether the Code can be fairly characterized as "aspirational" (it cannot) the Code was a false statement of Exscientia's actual policy. Hopkins and Nicholson created an environment where Hopkins was given free rein to use his status and power to harass and intimidate female employees.¶¶58-66. Exscientia was therefore ***not*** "committed to maintaining the highest standards of business conduct and ethics," ***did not*** regard it as "unacceptable to cut legal or ethical corners ***for…personal benefit***, " and ***did not*** "ensure we…***avoid [..] conflicts of interest***." The Code's purported mandate that "Exscientia personnel ***must act and perform their duties ethically, honestly and with integrity – doing the right thing even when 'no one is looking'", "acting responsibly in relationships***", with "***No winks. No Nods***" (¶91-92) is the antithesis of Hopkins's and Nicholson's true *modus operandi*. Devoid of "honesty and integrity", with no semblance of "acting responsibly in relationships" with female employees, Hopkins used Exscientia as his personal playground, while Nicholson- with a "wink" and "nod"- facilitated this. ¶¶58-64.

Thus, the Code falsely described Exscientia's policy as prohibiting unethical behavior and conflicts of interest.  ¶¶97, 109.

Second, Exscientia's Code was not aspirational. It set forth conditions that directors, officers, and employees were required to follow under penalty of disciplinary action or dismissal. ¶¶93-95. In similar circumstances, where codes of conduct have been presented as requirements and where defendants' alleged misconduct is at odds with the code, courts have rejected assertions that codes of conduct are merely aspirational statements that are not actionable. *See, e.g., Allegheny Cnty. Emp'ees' Ret. Sys. v. Energy Transfer LP*, 532 F.Supp. 3d 189, 221-24 (E.D. Pa. 2021) (statements in code which included reporting structure for violations actionable where they contradicted "unwritten policy" condoning bribery); *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 532-34 (S.D.N.Y. 2020) (statements may be actionable when they are "*so anathema to the alleged internal wrongdoing that, even if general or aspirational*, they [are] materially false"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-CV-6728, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (statements about merit-based decision-making, reporting mechanisms, and disciplining those who violate ethical standards were material and false because they were "directly at odds" with allegations of egregious sexual harassment involving "senior executives"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017)(aspirational statements

14

were material and false also because the plaintiffs had alleged "that no such aspirations were at play"); *Nykredit Portefolje Admin. A/S v. ProPetro Holding Corp.*, 2021 WL 9037758, at \*17 (W.D. Tex. Sept. 13, 2021) ("Because ProPetro's Code of Ethics specifies practices the company purports to adopt ... these statements are actionable"); *Holwill v. AbbVie, Inc.*, 2020 WL 5235005, at \*4 (N.D. Ill. Sept. 1, 2020) (code of conduct statements, "viewed in the light most favorable to Plaintiffs, are not inherently aspirational but are unqualified statements regarding [defendant's] conduct"); *In re CenturyLink Sales Practices and Sec. Litig.*, 403 F. Supp. 3d 712, 728 (D. Minn. 2019) ("[w]hile a code of conduct may generally be aspirational, in this case, CenturyLink presented [it] as fact" and "'required'" directors, officers and employees to abide by it).[7]

Third, Defendants' characterization of the Code as aspirational is simply another way of asserting that the Code constitutes immaterial "puffery," a proposition that is unsupported by the case law. As the Third Circuit has stated, "[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial, either because

---

[7] *See also In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 n.6 (S.D.N.Y. 2017) (statements in code "purported to reflect the Company's current state of affairs" that rules "are observed"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y. 2009) (code of conduct statements about independence are actionable where plaintiffs "provide sufficient facts to suggest that the statements … were false"); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at \*11 (D.N.J. Aug. 6, 2019) (code and SOX certifications actionable as "natural corollaries" to alleged anti-competitive conduct where 10-K represented Allergan adopted a code of conduct prohibiting agreements with competitors on price.).

it is so exaggerated ('You cannot lose.') or so vague ('This bond is marvelous.') that a reasonable investor would not rely on it in considering the total mix of [available] information." *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 200-01 (3d Cir. 1990). Here, the statements in Exscientia's Code are neither exaggerated nor vague. Rather, the Code set forth standards and rules that officers, directors, executives, and employees are *required* to follow or face disciplinary action, and further specifically provides that in order to take an action in contravention of the Code any executive or officer must obtain "approv[al] in writing by the Board," which had to be "promptly be disclosed to shareholders." ¶¶90-96.

In considering whether a code of conduct may be deemed inactionable puffery, courts have recognized that "context matters." *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019). Here, Exscientia's Code statements were made in the wake of the MeToo Movement, high-profile firings of CEOs for inappropriate relationships with subordinate employees, UK laws emphasizing gender pay equality, Exscientia's related statements concerning its corporate culture of "respect," "gender equality" and "*ensuring* employees are free from discrimination and coercion," and Exscientia's Gender Pay Gap Report which trumpeted Exscientia's commitment to advancing women's careers in the male dominated STEM field. ¶¶47-56. In this context, the Code statements did not represent vague aspirations; they represented concrete assurances to investors that

16

Exscientia operated within strict ethical standards necessary to maintain and expand Exscientia's business. Violations of this policy, ***especially by the Company's CEO and Chairman of the Board***- admittedly Exscientia's greatest assets- and Exscientia's *de facto* unwritten policy of allowing Hopkins to make a mockery of a safe and ethical workplace for women, were therefore highly material to investors.

Numerous courts have rejected similar arguments seeking to dismiss code of conduct statements as puffery. *See e.g.*, *ProPetro* at \*17-18 (rejecting statements concerning creating and enforcing an internal control environment so as to ensure compliance of company's top management with code of conduct as inactionable puffery because code "specifies practices the company purports to adopt or that purport to reflect the current state of the company"); *Moody's*, 599 F. Supp. 2d at 508-09 (rejecting statements concerning Moody's purported independence as puffery where "Moody's steadfastly maintained independence as a cornerstone of its business"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) ("it defies logic to suggest that … an investor would not reasonably rely on a statement, contained in what Defendants concede was a list of Goldman's business principles, that recognized Goldman's dedication to complying with the letter and spirit of the laws").

Defendants also assert that the Code statements are not false because they do not guarantee that "every employee would adhere to these practices in all cases." (MTD

17

10). But Plaintiffs do not contend that *any* violation of the Code automatically gives rise to liability. Courts have rejected this argument where, as here, the misconduct at issue concerns the company's top management. For example, in *Banco Bradesco,* the court reasoned that "while it may not be reasonable to an investor to rely on [Defendants'] statements as ensuring that no employee" would engage in misconduct, "the Court cannot conclude that reasonable investors could not at least rely on those statements reflecting that ***Bradesco's senior-most officers***…were not simultaneously doing so." 277 F. Supp. 3d 600, 660. *See, also, ProPetro* at *18 (rejecting argument that statements do not imply that all employees follow code's requirements, because "statements creating and enforcing an internal control environment that would ensure compliance ***of the company's top management with the Code of Ethics-*** although they may not be literally true- are statements with the ability to either inform or mislead prospective buyers and are therefore actionable."); *City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 133–35 (D. Mass. 2023) (code statements actionable where misconduct involved company's "Chairman, founder, CEO and moral compass"). *Signet* at *17 (statements in code actionable where culture of harassment involving "senior executives" was "directly at odds" with code of conduct); *In re Tenaris S.A. Sec. Litig.,* (code statement that company "will not condone bribery" misleading

where CEO allegedly bribed  government officials).[8]

Relatedly, courts have rejected the assertion that because the  SEC requires a company to adopt a code of conduct, statements made in a code of conduct/code violations are *per se* inactionable (MTD 9-10). *See, e.g., See e.g., Energy Transfer LP*, 532 F.Supp.3d 189, 221-24 (acknowledging *City of Roseville Emps' Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) and finding code actionably misleading where it included a reporting structure for violations and unwritten policy rendered portions of code misleading).

Finally, Defendants attack the AC's allegations concerning the Individual Defendants' Code violations as conclusory and lacking detail. They are wrong. The Complaint need not contain graphic details depicting Hopkins's harassment. FE1, who worked directly for Hopkins at Exscientia during the Class Period, provided a first-hand account attesting to the fact that, in direct contravention of the Code,

---

[8] Defendants' cases are distinguishable. *Toronto Dominion Bank*, 2018 WL 6381882 (MTD 10) did not involve misconduct by senior executives who attested to compliance with the code. The code at issue in *In re Cognizant Tech Solutions Corp. Sec. Litig.*, 2018 WL 3772675 (D.N.J. Aug. 8, 2018) was an internal document that could not have been relied on or material to investors. The Court in *Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017) recognized that the company's statement that it had a "zero tolerance policy" for ethics violations may have been actionable had it been made inside the class period. In *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F.Supp.3d, 533-34 (S.D.N.Y. 2020), unlike here, the CEO's misconduct took place years before the class period and was not "alleged to be so pervasive" such that the code of conduct statements were so "anathema to the alleged internal wrongdoing that" they were false and misleading even though general or aspirational.

Hopkins harassed and intimidated her, prompting her to leave Exscientia, and that there were other victims of Hopkins's harassment. ¶¶58-67. FE1 further attested to the fact that she feared Hopkins and that in August 2022 she told Nicholson about Hopkins's harassment but that he stood by and did nothing. ¶¶60-62, 64.

This is sufficient to satisfy 9(b) because the Complaint provides the "who" (Hopkins and Nicholson), "what" (Hopkins harassed and intimidated FE1 creating a hostile work environment, Nicholson knew about it and covered it up, and both knew this conduct and failure to disclose it made the statements in Excientia's Code of Conduct, 20-F's, board charters, and Gender Pay Gap Report misleading), "when" (2022/August 2022 when FE1 informed Nicholson) "where" (Exscientia's corporate office where FE1 worked directly for Hopkins), and "how" (Exscientia's Class Period 20-F's, board charters and Gender Pay Gap report which misled investors about Exscientia's Code Defendant' adherence thereto, corporate culture of respect, and risks related to senior officers' misconduct, *inter alia*). *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (particularity only requires a plaintiff to "plead the who, what, when, where, and how: the first paragraph of any newspaper story."); *In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at *7–8 (D.N.J. Dec. 6, 2018) (CW statements not conclusory because even though "not exceedingly precise" they provide where the misconduct occurred and how and why it occurred).

20

Moreover, Defendants *admitted* that Hopkins engaged in "relationships" with employees that were "inappropriate" and "inconsistent" with the Company's standards and values, and *admitted* Nicholson knew about the misconduct but failed to take appropriate action and instead "addressed the situation directly." ¶¶129-30.

### 2. The Corporate Culture and Gender Pay Gap Statements Are Actionable

For many of the same reasons, the statements contained in Exscientia's Class Period 20-F's, Proxy Statements, and Gender Pay Gap Report pertaining to Exscientia's corporate culture and gender diversity efforts are actionable. ¶¶102-17.

First, many of these statements are concrete representations of present or historical fact and are not subject to protection by the PSLRA safe harbor (MTD 16). For example, "diversity ___is___ an important area of focus for us," "we ___are___ committed to" an "inclusive work environment." ¶¶113-14. These specific statements were demonstrably false given the toxic work environment Hopkins created (and Nicholson enabled). Many of the alleged statements are actionable because they are "mixed/present future statement[s]" which are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255; *see, e.g.,* ¶¶102, 113-14. ("We will ___continue___ to work [ ] to ensure that Exscientia ___remains___ an inclusive and welcoming place to work for all while working to improve our [gender]…diversity", "we ___are committed___ to offering, fair, equal and unbiased recruitment, promotion and reward mechanisms", "we will ___continue___ to

21

focus on [initiatives]…such as, "aim[ing] to ensure at least 50% of all vacant Executive Director and above roles are filled by women.") Defendants contend that "nothing in the AC shows" that Exscientia did not for example, "respect human rights." (MTD 15). Defendants ignore the AC's allegations establishing that Hopkins's conduct- harassment of FE1 to the extent that she left Exscientia and moved hundreds of miles away out of intimidation and fear (¶62)- is incompatible with respecting human rights and a workplace "free from coercion." Defendants also miss the import of Plaintiffs' allegations- that these statements are misleading by virtue of omission of facts- *i.e.,* Hopkins's misconduct and Nicholson's knowledge and inaction in the face of it. "[O]missions of existing facts or circumstances are not forward-looking, and thus do not qualify for safe harbor protection." *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014). Put another way, these material omissions rendered Defendants' statements misleading "because the excluded fact[s] show[] that [Defendants] lacked the basis for making those statements that a reasonable investor would expect." *Omnicare, Inc. v. Laborers District Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1333 (2015). Thus, they do not fall within the safe harbor. And contrary to Defendants' assertion (MTD 16), the AC *does* allege that these statements were made with "actual knowledge" that they were false when made and are thus not subject to safe harbor protection. For example, when Hopkins stated, "we will respect the human rights…" in the 20-

F's he signed, Hopkins knew that he was not then respecting his employees' "human rights." ¶¶106-07.

Second, these statements are not "textbook inactionable puffery." (MTD 15). The materiality of Defendants' misstatements is a question of fact that should not be decided on the pleadings. *See, e.g., Mylan Labs*, 230 F.3d at 599 ("where there is room for differing opinions on the issue of materiality, the question should be left for jury determination"). In addition, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015). The context in which these statements were made renders them material: the MeToo Movement, recent UK workplace laws, and the many high-profile CEO firings in the U.S. and UK leading up to the Class Period. ¶¶47-56. Moreover, the statements in Excientia's Gender Pay Gap report were intended to distinguish Exscientia as being a progressive company in terms of promoting the careers of women in the male-dominated STEM field. ¶¶115-17. *See, e.g., Goldman Sachs*, 506 F. Supp. 2d at 240 (statement about "integrity" material and actionable where company made it to distinguish itself from other institutions). To be sure, Exscientia had no duty to include any narrative in reporting gender pay gap figures but it affirmatively chose to do so to distinguish itself by "encouraging girls to consider STEM." ¶117.[9]

_____

[9] Defendants' cited authorities are distinguishable. In *Lopez v. CTPartners Exec.*

23

### 3.    *Defendants' Risk Disclosure Statements Are Actionable*

Exscientia's risk related statements are actionable. Throughout the Class Period Defendants warned that employees "***may engage in misconduct or other improper activities***…which ***could*** cause significant liability for us and harm our reputation." ¶100. Relatedly, Defendants warned "loss of the services of executive officers or other key employees ***could*** seriously harm our ability to successfully implement our business strategy." *Id.* These statements were false and misleading because at the time they were made Hopkins was engaging in "misconduct" and "improper activities" and the warning that the loss of key employees could harm Exscientia was not sufficiently tailored to the specific future projections. ¶¶101, 109. *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[W]arnings of specific risks...do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of risks described....").

Courts find risk-related statements actionable under analogous circumstances.

---

*Search*, 173 F. Supp.3d 12, 30 (S.D.N.Y. 2016) the statements were made at a "highly general level" and "did not address a concrete policy or practice, whereas the statements in Exscientia's Gender Pay Gap report for example, specifically referenced creating a workplace that advanced careers of women in STEM in the face of a hand-on CEO whose conduct was directly at odds with this. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010) concerned vague statements about having a "disciplined" pricing policy which were incapable of being reasonably relied upon in light of the complexity of Aetna's business. None of the statements at issue in *Okla. L. Enf't. Ret. Sys. v. Papa John's Int'l*, 444 F.Supp.3d 550 (S.D.N.Y. 2020) invoked gender equality or freedom from discrimination or coercion and the statement in the code of conduct said nothing about conflicts of interest, unlike here.

24

For example, in *Howard v. Arconic*, 2021 WL 2561895, at *6 (W.D. Pa. June 23, 2021) the court found that the company's practice of selling unsafe materials which created a fire hazard rendered statements warning about potential compliance issues and safety risks plausibly misleading "because [defendants] failed to disclose an allegedly ongoing and systematic sales practice of a sufficient magnitude that increased the likelihood of that risk materializing in a serious way."[10]

Defendants incorrectly assert that their risk-related statements are not actionable because the harms associated with Hopkins's and Nicholson's misconduct had not yet materialized. (MTD 18-19). First, the Third Circuit has never announced such an unequivocal rule, and the cases Defendants cite in support of this are distinguishable.[11] Second, the risk of Hopkins's termination had already

---

[10] *See also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("the failure to disclose then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk. . . . One cannot, for example, disclose . . . a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors."); *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 246-47 (5th Cir. 2009) (finding that cautionary language was not meaningful where the warning did not "disclose the specific risks and their magnitude"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) ("To suffice, the cautionary statements must be substantive and tailored to the specific future projections" alleged to be misstatements by the Plaintiffs).

[11] In *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *4 (3d Cir. June 14, 2022) (MTD 18) plaintiffs alleged that the risks related to use of a mineral oil placebo in a clinical trial had already materialized, when in fact the complaint only alleged a difference in opinion as whether the mineral oil placebo might be inert- the exact risk the company had disclosed. In *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017) (MTD 18) plaintiffs alleged Globus's warning that loss of a

25

materialized because when Exscientia issued the risk disclosures in its 2022 20-F FE1 had already informed Nicholson of Hopkins's misconduct. ¶62. *Cf. CBS Corp.* 536-37 (risk statement inactionable because complaint did not allege defendants "knew that the risk of Moonves's termination for sexual misconduct had 'already transpired'" when it issued risks disclosures…Consistent with the [Code of Ethics] Redstone instituted an internal investigation" [when he learned of the risk].) Here, Plaintiffs amply allege that given Hopkins's egregious misconduct, the risk it would come to light and he would be forced to leave Exscientia was nearly inevitable. Nicholson could anticipate this: he was aware of Hopkins's misconduct, attempted to cover it up, and knew that it was only a matter of time before either FE1 (or another victim) would either report Hopkins or his misconduct would otherwise be discovered and that both he and Hopkins would be forced out of the company, causing harm to shareholders.

Whether a risk-related statement or otherwise, once a company has chosen to speak on an issue—even an issue it had no independent obligation to address- it

---

distributor could have an impact on sales was misleading because Globus failed to disclose the termination of a relationship with a particular distributor. The Third Circuit held that defendants were not required to disclose the termination to make the risk warning not misleading not only because the risk of loss had sales had not yet come to fruition but because "plaintiffs [have not] sufficiently plead that a drop in sales was inevitable," and that without additional details concerning the nature of the distributor relationship the Court "cannot conclude that Globus and its executives should have expected a [ ] financial impact…" *Id.* at *243.

26

cannot omit material facts related to that issue so as to make its disclosure misleading. *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated."). Defendants had no independent duty to discuss potential employee misconduct and the risks associated it. Once they did, they were required to disclose Hopkins's misconduct to make the existing statements not misleading. Accordingly, whether the adverse consequences of Defendants' misconduct had come to fruition does not dictate whether their statements are actionable. *See, e.g., In re Tenaris S.A. Sec. Litig.*, 493 F.Supp.3d 143, 160-61 (S.D.N.Y. 2020) (risk factor disclosure using hypothetical qualifier "if" to warn employee could fail to comply with law, when executive had already broken law is "actionable deceit" despite that adverse consequence warned of had not yet manifested itself).

### 4. Statements in Exscientia's Board Committee Charters Are Actionable

Exscientia's Class Period 20-F's referenced the Board's Audit, Remuneration, and Corporate Governance committee charters which represented, *inter alia,* that the respective committees: 1) monitored adherence to the Company's Code of Conduct, 2) evaluated the CEO's performance taking into account whether he "fosters a corporate culture that promotes the highest levels of integrity and the highest ethical

standards" and adjusted his compensation accordingly, 3) evaluated directors and officers for "potential conflicts of interest" and whether their "integrity" and "judgment" is "appropriate for the company", and 4) oversees and reviews "corporate social responsibility and employee diversity." ¶¶118-21, 123, 125. These statements are misleading because Defendants failed to perform these functions. ¶¶122, 124, 126.

Recent caselaw confirms that Exscientia's committee charter statements are actionable. In *Craig v. Target Corp.*, 2024 WL 4979234 at *9 (M.D. Fla. Dec. 4, 2024) plaintiffs alleged statements in Target's proxy statements concerning the board's risk oversight functions were misleading where the board failed to appropriately oversee social and political risks given Target's engagement in a promotional campaign that led to consumer backlash on social/political grounds. The Court held that the "oversight" statements were misleading, reasoning:

> The existence of the [committee] implies a structured investigation and analysis of social and political risks. Further, due to its formal status, the [committee] creates the impression among investors that social and political risks are being considerably analyzed, reviewed, and monitored. Plaintiffs allege that the social and political risks were not properly monitored because "[a] reasonable investor would have understood the statement that the [committee] was 'fulfilling' its 'oversight responsibility' for 'social and political issues and risks'" would mean the [committee] was monitoring for social and political backlash." *Id.* at *9.

The same is true here. A "reasonable investors would have understood" that as the Chair of the Nominating and Corporate Governance Committee Nicholson

28

would have "evaluated" Hopkins's "potential conflicts of interest," "reviewed" whether Hopkins "can and do[es] provide integrity, experience, [and] judgment…appropriate for the Company" and "recommended and communicated" to the Board concerning Hopkins's behavior.[12] ¶122. The statements in the Charters were not accurate representations of how the Committees in fact functioned.

In response, Defendants assert that there is "no claim" that "Nicholson did not 'recommend,' 'communicate,' 'monitor' and all the rest."(MTD 19). Defendants are wrong and their argument ignores the AC's allegations. Had Nicholson "communicated" with the Board concerning whether, in his "evaluation of the CEO's performance" the CEO was acting with the "highest levels of integrity and ethical standards," and "monitor[ed] compliance with…the Company's Code of Business Conduct and Ethics" he would have reported Hopkins's misconduct to the Board. The AC explicitly alleges that Nicholson acted in direct contravention of his stated duties, *inter alia*, to "communicate with the Board" and "monitor compliance

---

[12] *See also Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 95 (Del. Ch. 2023) (proxy statement's disclosure that "'Board committees … play active roles in fulfilling the risk oversight function'" "reassured [company] stockholders that they were complying" with oversight obligations); *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *8-9, 14 (S.D. Ohio May 11, 2021) (proxy statement's disclosure that there were "oversight processes in place" "assured the shareholders [directors] were protecting the Company from risk"); *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 75 (D.C. Cir. 1980) (proxy statement's mention of "[t]he existence of a committee implies a structured investigation and analysis" and makes an "implication of careful oversight").

with… the [ ] Code[ ]" because he knew Hopkins violated the Code and intentionally *hid* it from the Board, as Exscientia explicitly *admitted.*[13] ¶129.

Defendants also assert that the statements in the Board Committee charters cannot be actionable because they "never guaranteed that every director would adequately perform every responsibility every time." (MTD 20) This *reductio ad absurdum* argument is spurious, because, as with the Code of Conduct statements, the AC nowhere alleges that *any* failure to act in accordance with the charter's directives renders the statements therein materially misleading. As with the Code of Conduct statements, it is a question of materiality and degree. *See supra at* III.B.1.

### 5.    *Hopkins's SOX Certifications Are Actionable*

Consistent with the above, the AC adequately alleges that Exscientia's SEC

---

[13] Defendants' cases are distinguishable. *Kooker ex rel. Hecla Mining Co. v. Baker*, 497 F.Supp.3d 1, 7 (D. Del. 2020) (MTD 20) concerned statements regarding making recommendations on the advisability of acquisitions which plaintiffs alleged were misleading because the company acquired an underperforming mine. The court found the statement not misleading in part because plaintiffs did not allege any director failed to adequately oversee the acquisition or even "connect any of these allegations to the individual directors." *Id.* at 7. Here, the AC explicitly alleges that Nicholson acted in direct contravention of his stated duties, *inter alia*, to "communicate with the Board" and "monitor compliance with… the [ ] Code of Business Conduct and Ethics" because he knew Hopkins violated the Code and intentionally *hid* it from the Board by engaging outside counsel, as Exscientia explicitly *admitted.* Unlike plaintiffs in *Hutton v. McDaniel*, 264 F.Supp.3d 996 (D. Ariz. 2017) and *Guo v. Mahaffy*, 2020 WL 5798531 (D. Colo. Sept. 29, 2020) (MTD fn. 10) Here Plaintiffs in fact allege that Defendants failed to execute their responsibilities under the Charters, not that they executed their responsibility "inadequately." *See, e.g.,*  pp. 127 ("Nicholson…failed to evaluate the CEO's performance with an eye to the 'highest levels of integrity and ethical standards' and to adjust the CEO's compensation and employment terms accordingly.")

filings contained numerous false and misleading statements. Hopkins's SOX certifications attesting to the accuracy of Exscientia's 20-F's are actionable because Hopkins had knowledge of the false statements therein. ¶¶89, 104, 108-9, 140. *See In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at \*10 (D.N.J. Dec. 6, 2018) (SOX certifications were actionable despite finding that financial figures in the accompanying report were inactionable).

## C.   The AC Adequately Alleges Scienter

To adequately plead scienter, the Third Circuit requires plaintiffs to allege facts giving rise to a strong inference of "either reckless or conscious behavior." *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 280 The relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310 (emphasis in original). An inference of scienter is "strong" if it is "cogent and compelling," *id.* at 324, and "*at least as likely as* any plausible opposing inference." *Id.* at 328. The inference of scienter need not be *more* likely than a plausible opposing inference; the tie goes to

31

the plaintiff. *Id.* at 324. Moreover, "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* Scienter can be inferred from "circumstantial evidence." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

### 1. The AC Adequately Alleges Defendants' Conscious Disregard and/or Recklessness

As the AC alleges, Hopkins was acutely aware that his public statements were false or misleading because he was, at the time, directly responsible for creating the hostile and unlawful work environment that FE1 described. Hopkins had actual knowledge that the statements in Exscientia's Code of Conduct and risk warnings, *inter alia,* were inaccurate. ¶¶105, 135. Likewise, Nicholson had actual knowledge of Hopkins's harassment of FE1 and knew failing to report Hopkins's misconduct to the Board made the statements in the Code and Board Committee charters, *inter alia* materially misleading absent disclosure of Hopkins's misconduct (or Hopkins obtaining a waiver and disclosing it to investors). ¶¶122, 124, 127. Further, Hopkins served as CEO and signed the SEC filings touting the Company's Code of Conduct. ¶¶89, 106, 108-110. "Courts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents." *Steamfitters Local 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at *9 (E.D. Pa. Sep. 30, 2011). This supports his scienter. *See, e.g., Energy*

32

*Transfer*, 532 F. Supp. 3d at 228 (finding scienter for CEO who "is one of the alleged speakers in the 10-K filings with the SEC" where "the 10-K filing touted the Code of Ethics.").

Where, as here, the alleged fraud is based on the non-disclosure of facts, "evidence that the defendants had actual knowledge of the facts is sufficient to show scienter." *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *5 (D.N.J. 2018)(citing *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237–38, (3d Cir. 2004)).

Tellingly, Hopkins and Nicholson do not deny any of the alleged misconduct or their knowledge thereof. Instead, they circularly argue that scienter is not adequately alleged because the AC has not adequately alleged falsity and materiality. MTD at 27 ("Plaintiffs do not and cannot explain how vague statements…were 'obviously' false…"; ("the challenged statements are too generic"). For the reasons in III.B. *supra,* Plaintiffs have pled adequately material falsity.

Further, the misconduct here is precisely the type of conduct that courts find sufficient in a post "MeToo" corporate setting where senior executives are alleged to have been involved in sexual misconduct. For example, in *In re Signet Jewelers Ltd. Securities Litigation,* the court concluded that plaintiff sufficiently alleged scienter where "one of the named Defendants, was implicated in the very sexual misconduct [at issue] -which the Court, for present purposes[] presumes to be true." 2018 WL 6167889, at *18 ("Having alleged with supporting factual matter that

33

Defendants were aware of, *or* had access to information pertaining to, the serious nature of the allegations[,] ... Plaintiff has adequately pleaded that Defendants either had present knowledge or were reckless as to the misleading nature of their disclosures regarding [] their corporate policy against sexual harassment.").

### 2.    *The Nature of the Misconduct Supports an Inference of Scienter*

Where, as here, the Individual Defendants engaged in deliberately illegal behavior courts have no difficulty finding scienter. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("a strong inference of scienter arises where the complaint alleges that *defendants* engaged in deliberately illegal behavior."). *In re Novastar Fin. Sec. Litig.*, 2005 WL 1279033, at *6 (W.D. Mo. May 12, 2005) (scienter alleged where complaint alleged defendants concealed illegal conduct from investors).

Hopkins and Nicholson acted intentionally to conceal Hopkins's sexual harassment. Exscientia admitted that Hopkins's "relationships" were at odds the Exscientia's stated policies and that Nicholson had knowledge of and concealed at least one of Hopkin's inappropriate "relationships." ¶¶61, 69, 75, 129. Numerous courts have held allegations that a defendant took steps to hide or cover up misconduct give rise to a strong inference of scienter. *SEC v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015) (defendant's "effort to mask his violations of federal securities law demonstrates a high degree of scienter") *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (executive's "alleged attempts

34

to hide" the misconduct "also support a strong inference of scienter").

### 3. Exscientia's Admission, Hopkins's Termination, and Nicholson's Resignation Support Scienter

Hopkins was Exscientia's CEO and founder and the backbone of the Company. ¶¶34-46. Hopkins was terminated "for cause and effective immediately," because, as Exscientia admitted, Hopkins engaged in "inappropriate" "relationships" with employees that were "inconsistent with the Company's standards and values." ¶129. Exscientia also admitted that Nicholson resigned after the internal investigation discovered that Nicholson had "prior knowledge" of Hopkins's misconduct and impermissibly "addressed the situation directly." *Id.* Exscientia's admission of Hopkins's and Nicholson's misconduct, Hopkins's termination, and Nicholson's resignation support scienter. Courts across the country, including those in this Circuit, have found that the suspicious circumstances and timing of high-level employee departures contribute to an inference of scienter. *See Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (relying on "allegations regarding the timing of the resignation of senior management" in finding inference of scienter); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 541 (D. Del. 2012) (same); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (same).

### 4. Defendants Do Not Allege a Competing Inference Against Scienter

Defendants correctly note that motive is not required. (MTD 22). *See GSC*

*Partners CDO Fund*, 368 F.3d at 238 (where motive is "not apparent" scienter can be adequately pled "by identifying circumstances indicating conscious behavior by the defendant"). Insider sales, while sometimes a factor in securities fraud class actions, are also in no way a prerequisite to adequately pleading scienter. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) ("while insider sales can support an inference of scienter, they are not required"). Despite this, Defendants devote the bulk of their scienter section to addressing motive and lack of insider sales. (MTD 22-25). But as the Third Circuit held, scienter "will ultimately not rest on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. The cases finding scienter despite no allegations of motive are insider sales are legion, and there are several such recent cases finding scienter and holding actionable statements in a company's code of conduct. *See, e.g., City of Fort Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 130 (D. Mass. 2023) (code of conduct statements actionable and scienter found despite no insider sales or motive allegations, "crucial question" as to scienter was whether CEO was aware of misconduct that contravened code statements); *Howard v. Arconic*, 2021 WL 2561895, at *21–22 (W.D. Pa. June 23, 2021)(corporate scienter doctrine applied to impute scienter of non-executive to company, code of

36

conduct statements actionable, no allegations of motive or insider sales); *In re Signet Jewelers Ltd. Sec. Litig.,* 2018 WL 6167889, at *18 (S.D.N.Y. Nov. 26, 2018) (no allegations of motive or insider sales, finding inference of scienter that defendants either had knowledge or were reckless as to misleading nature of disclosures regarding corporate policy against sexual harassment "at least as compelling as the one Defendants offer- that their disclosures were in good faith.").

In response to the AC's scienter allegations, Defendants offer no competing non-culpable inference, much less one that is more compelling than the inference of scienter. Nor do Defendants assert that FE1's statements are unreliable. Indeed, they would be hard pressed to do so given that FE1 worked directly for Hopkins and interacted with him daily. Instead, Defendants incorrectly assert the AC does not allege scienter with particularity, "the who, what, when, where, and how." (MTD 26). Defendants are wrong. The "who, what, when, where, how" requirement goes to verifying that defendants acted either consciously or recklessly. *Burlington Coat Factory*, 114 F.3d at 1422. *See, e.g., Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 674 (D.N.J. 2021) (in case involving allegations company issued false inventory valuations "who, what, when, where, how" sufficiently particularized: "the 'who' is [CEO]", "'what' is that he believed [Company] had inventory oversupply…that they did not disclose'", "'when is as early as January or February 2019…'how' is via both failures to disclose oversupply…"). As discussed in III.B.1.

37

*supra* the AC's allegations are sufficiently particularized.

Finally, because the AC has adequately pled a strong inference of scienter for Hopkins and Nicholson, they have done so for Exscientia. *In re Honeywell Intern., Inc. Securities Litig.,* 182 F.Supp.2d 414, 429–30 (D.N.J.2002)(denying corporation's motion to dismiss where scienter properly pled against officers).

### D.    The AC Adequately Alleges Loss Causation

Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA; all that is required is that plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind," consistent with Rule 8(a). *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 348 (2005); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180 n.24 (3d Cir. 2001) (in order to establish loss causation, "a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss."). The Third Circuit has "adopted a practical approach to loss causation, in effect applying general causation principles." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007). The AC sufficiently alleges loss causation under this standard. On February 13, 2024, Exscientia revealed Hopkins's termination due to his "relationships" with employees that "were inappropriate and inconsistent with the Company's standards and values." ¶128. Exscientia further revealed Nicholson resigned because he knew about this and improperly "addressed

38

the situation directly." On this news Exscientia's share price fell 22.9%. The import of this disclosure is that Exscientia's top executive was terminated for misconduct that was "inconsistent" with the Company's "standards and values," and that Nicholson covered up Hopkins's misconduct rather than put it to a stop through formal board action, which is what the AC alleges Defendants lied about.

Defendants assert that because Exscientia's press release did not specifically reveal the "standards and values" Hopkins violated, or mention the Code, loss causation is lacking. MTD 29. This argument fundamentally misstates the standard for pleading loss causation. Defendants are arguing that the corrective disclosure must completely mirror the false statements during the Class Period. This is not the standard in the Third Circuit. Although a corrective disclosure must relate to the same subject as the misrepresentation, there is no requirement that the disclosure mirror the earlier misrepresentation. *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020); *In re Bristol–Myers Squibb Sec. Litig.*, No. 00–1990, 2005 WL 2007004 at *20, *22 (D.N.J. August 17, 2005) (rejecting any notion that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud," and holding that a disclosure need only "touch upon" the alleged fraud to satisfy the loss causation pleading standard); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F.Supp.2d 822, 828 (D.N.J.2006) ("plaintiff need only allege that his losses were attributable to *some form of revelation* to the

39

market of the wrongfully concealed information.").[14]

Likewise, the AC's allegation that Exscientia's press release failed to disclose that Hopkins's conduct was not only inappropriate but constituted non-consensual harassment in no way negates loss causation (MTD 29-30). Because "corporate wrongdoers rarely admit that they committed fraud it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Moreover, "the fact that the stock price fell without a more complete and detailed disclosure, if anything, only goes to show that the tip of the iceberg was enough to cause the loss." *Bristol-Myers* at *21. This is exactly what occurred here.[15]

## IV.   CONCLUSION

For the foregoing reasons the Court should deny Defendants' motion to dismiss. Plaintiffs respectfully request leave to amend should the Court dismiss any part of the Complaint. Fed. R. Civ. P. 15(a) (2) ("The court should freely give leave when justice so requires.").

---

[14] Defendants' reliance on *In re Intelligroup*, (MTD 29) is misplaced. As the court in *In re DVI Sec. Litig.,* 2010 WL 3522090, *fn10 (E.D. Pa. 2010) noted, *Intelligroup* "also suggested that disclosures that 'implicitly touched' on errors may be sufficient" and "is not a compelling endorsement of the mirror image approach."

[15] The AC adequately alleges a Section 20(a) claim because it has adequately alleged a primary violation of Section 10(b). Defendants do not challenge the sufficiency of Plaintiffs' Section 20(a) claims on any other basis. (MTD 30).

Dated: March 24, 2025                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         /s/ Laurence M. Rosen
                                         Laurence M. Rosen, Esq.
                                         One Gateway Center, Suite 2600
                                         Newark, NJ 07102
                                         Telephone: (973) 313-1887
                                         Fax: (973) 833-0399
                                         lrosen@rosenlegal.com

                                         Sara Fuks    (*Pro Hac Vice*)
                                         275 Madison Avenue, 40th Floor
                                         New York, NY 10016
                                         Telephone: (212) 686-1060
                                         Fax: (212) 202-3827
                                         sfuks@rosenlegal.com

                                         *Lead Counsel for Plaintiffs*

41