[Docket No. 26]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| IN RE EXSCIENTIA P.L.C. SECURITIES LITIGATION | Civil No. 24-cv-5692 (RMB) (AMD)<br><br>**OPINION** |

**RENÉE MARIE BUMB, Chief United States District Judge:**

Congress enacted the Securities Exchange Act of 1934 to "protect investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). Not all corporate wrongdoing is covered by the Exchange Act. *See generally Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473-80 (1977). Plaintiffs Frank Campanile and Robert Sullivan seek to extend the Exchange Act's reach to include inappropriate workplace relationships and conduct.

According to Plaintiffs, Defendants Exscientia P.L.C., Andrew Hopkins (Exscientia's former Chief Executive Officer), and David Nicholson (Exscientia's former Chairman of the Board of Directors) violated federal securities law because Hopkins had inappropriate relationships with two female subordinates and sexually harassed them. Plaintiffs contend that Hopkins' inappropriate conduct not only violated Exscientia's code of conduct, but contravened the company's statements about fostering an inclusive workplace and promoting diversity. An employee reported Hopkins' conduct to Nicholson, who, according to Plaintiffs, did nothing—despite his obligations to report that complaint under the code of conduct and various company committee charters. Hence, Plaintiffs claim, Defendants violated federal securities law by not disclosing Hopkins' and Nicholson's misconduct, and

that failure to disclose rendered Defendants' statements in public filings about, among other things, Exscientia's code of conduct and fostering an inclusive workplace false and misleading.

For the reasons that follow, most statements Plaintiffs challenge are inactionable puffery—meaning, they are immaterial because no reasonable investor would rely on them when deciding to invest.  Most statements contain aspirational language like "we are committed to," "expect," "strive," "aim," and so on, which amount to Exscientia's statements of goals—not material facts.  These aspirational statements cannot be measured for compliance.  To hold a company liable for securities fraud for failing to live up to its stated aspirations could turn all corporate wrongdoing into securities fraud.  The law requires more. The alleged inappropriate conduct here was not so pervasive as to suggest Exscientia held none of its stated aspirations.

Defendants' failure to disclose Hopkins' and Nicholson's misconduct did not render the challenged statements false or misleading either.  That an executive had an inappropriate relationship with a subordinate—without more—does not render a company's statement about having a code of conduct false or misleading.  Nothing in Exscientia's statements that Plaintiffs challenge suggests or implies Hopkins or Nicholson would not violate Exscientia's code of conduct or would not engage in misconduct.

Therefore, for the reasons below, the Court grants Defendants' motion to dismiss.  The Court dismisses Plaintiffs' claims without prejudice.

## I. BACKGROUND[1]

### A. Hopkins takes Exscientia from the laboratory to Wall Street

Hopkins founded Exscientia in 2012 while working in his laboratory in the United Kingdom. [Am. Compl. ¶¶ 2, 28, 34 (Docket No. 17.)] Exscientia is a technology-driven drug design company that uses artificial intelligence to help in the drug discovery process, such as potential cancer treatments. [*Id.* ¶¶ 2, 34, 38.] Exscientia partners with pharmaceutical companies to develop new drugs. [*Id.* ¶ 38.]

Through various partnerships, Hopkins eventually took Exscientia from the laboratory to Wall Street. [*Id.* ¶ 4.] Exscientia went public in October 2021 and began trading on the NASDAQ. [*Id.*; *see also id.* ¶¶ 39-40.] Hopkins served as Exscientia's Chief Executive Officer and Executive Director before and during the Class Period (March 23, 2022 to February 12, 2024). [*Id.* ¶¶ 1, 29.] Defendant David Nicholson served as the Chairman of Exscientia's Board of Directors (Board), Nomination and Corporate Governance Committee (Nomination Committee), the Audit Committee, and the Remuneration Committee before and during the Class Period. [*Id.* ¶ 30.]

### B. Exscientia's Corporate Governance Documents

Before going public, Exscientia adopted a Code of Business Conduct and Ethics (the Code) as required by the Securities and Exchange Commission's (SEC) regulations and NASDAQ rules. [*Id.* ¶ 57.] *See also* 17 C.F.R. § 229.406; NASDAQ Rule 5610. The Code

---

[1] The Court takes the following allegations from the Amended Complaint, as well as the documents referenced in the pleading and matters of public record. The Court accepts the factual allegations as true and views them in Plaintiffs favor. *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009). The Court will "disregard labels, conclusions, and 'formulaic recitation[s] of the elements[]'" of the cause of action. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (first alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

is four pages long with an acknowledgment page and can be found on Exscientia's website. [Am. Compl. ¶¶ 91, 93; *see also* Decl. of Elizabeth M. Wright (Wright Decl.) ¶ 2, Ex. A (the Code) (Docket Nos. 26-2, 26-3)[2].]  The Code outlines the standards and values Exscientia expects its employees to live up to.  [Code at 1.]  It applies to "directors, executives, employees, and independent contractors of Exscientia and its subsidiaries."  [*Id.*]

The "Code is a statement of certain fundamental principles, policies and procedures that govern Exscientia personnel in the conduct of [its] business."  [*Id.* at 3.]  It says Exscientia is "committed to maintaining the highest standards of business conduct and ethics."  [*Id.* at 1.]  The Code declares, "It is unacceptable to cut legal or ethical corners for the benefit of [Exscientia] or for personal benefit."  [*Id.*]  The Code is "designed to ensure" that Exscientia and its employees:  (1) "operate . . . business ethically and with integrity;" (2) "avoid actual or apparent conflicts of interest;" (3) "comply with the letter and spirit of all laws and Exscientia policies . . . .;" and (4) "promptly internally report suspected violations of this Code."  [*Id.*]  The Code also says, "Consistent with our core values, Exscientia personnel must act and perform their duties ethically, honestly and with integrity – doing the right thing even when 'no one is looking.'"  [*Id.*]

Exscientia "will" investigate "[r]eported violations of the Code" and take "appropriate action."  [*Id.* at 3.]  Any violations of the Code "may result in disciplinary action[,]" which

---

[2] Defendants have offered the Code and other documents containing the statements referenced in the Amended Complaint, like Exscientia's Annual Reports.  [*See generally* Wright Decl.]  "[W]hen a complaint references extrinsic documents, courts can consider the documents so long as they are 'undisputedly authentic' and 'the complainant's claims are based upon [those] documents.'" *Premier Orthopaedic Assocs. of S. NJ, LLC v. Anthem Blue Cross Blue Shield*, 675 F. Supp. 3d 487, 490 (D.N.J. 2023) (alteration in original) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).  Plaintiffs have not challenged the authenticity of any document Defendants have proffered, and as such, the Court will consider them.

includes "termination of employment and legal proceedings if warranted." [*Id*.]  The Code also provides a reporting system for Code violations.  [*Id*. at 3-4.]  And it says Exscientia "expects [its] employees to do their best to comply with this [reporting] policy."  [*Id.* at 4.]  The Code also says that employees who know about a violation of the Code and fail to report it, "may be subject to disciplinary action[.]"  [*Id.*]

Given their positions, Hopkins and Nicholson were "required to execute" the acknowledgment annexed to the Code.  [Am. Compl. ¶ 93.]  Plaintiffs claim that "Class Period investors were told" Hopkins and Nicholson "each certified that they understood and would comply with the Code and report [any] possible violations of the Code."  [*Id.*]

In addition to the Code, Exscientia had written charters for three "standing committees" for the Board:  the Nomination Committee, the Audit Committee, and the Remuneration Committee.  [Am. Compl. ¶ 118; Wright Decl. ¶¶ 8-10, Exs. G-I (Docket Nos. 26-3).]  Like a code of conduct, NASDAQ requires companies to adopt and file board committee charters.  NASDAQ Rule 5605.

The Nomination Committee's Charter says the Committee's purpose is to:  (1) "help the Board oversee the Company's corporate governance functions[;]"  (2) "identify, evaluate, recommend, and communicate with candidates qualified to become Board members or nominees for directors of the Board[;]"  and (3) "make other recommendations to the Board relating to the directors of the Company."  [Nomination Committee Charter at 1.]  The Charter also says, "[t]he [Nomination] Committee will communicate with the Board, Committee chairpersons, members of senior management, and independent professional advisors to the Board and its various committees, as appropriate."  [*Id.* at 2.]  And it allows the Nomination Committee to "retain legal, accounting, or other outside advisors" if the

Committee "concludes that it must" do so.  [*Id.*]  The Charter also lays out the Nomination Committee's responsibilities, which according to the Charter, "are a guide and should remain flexible to account for changing circumstances and needs."  [*Id.*]

These responsibilities include the Nomination Committee's responsibility "to identify and evaluate candidates, including nomination of incumbent directors for re-election and nominees recommended by shareholders to serve on the Board."  [*Id.*]  For this task, the Charter says the Nomination Committee must use certain "criteria approved by the Board," and consider "potential conflicts of interest, director independence, and other requirements."  [*Id.*]  The Charter also says the Nomination Committee must "periodically review" the Board's performance.  [*Id.*]  And in making this assessment, the Committee must evaluate "the Board's contribution as a whole and the Board's effectiveness in serving the best interests of the Company and its shareholders, specific areas in which the Board and/or management believe contributions could be improved, and overall Board composition and makeup."  [*Id.* at 2-3.]  This requires the Nomination Committee to consider "whether the directors, both individually and collectively, can and do provide the integrity, experience, judgment, commitment, skills, diversity and expertise appropriate for the Company."  [*Id.* at 3.]  And for "Environmental, Social and Corporate Governance (ESG) Matters" the Charter says the Nomination Committee must "oversee and periodically review [such] matters relevant to the Company's business, including policies and practices concerning[,]" among other things, "corporate social responsibility" and "employee diversity."  [*Id.*]

According to its Charter, the Audit Committee's purpose is to help the Board "in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal controls and legal compliance functions of the

Company and its subsidiaries[.] [Audit Committee Charter at 1.] This includes helping the Board's oversight of, among other things, Exscientia's "corporate accounting and financial reporting process," the selection of accountants to serve as "independent outside auditors[,]" compliance with "legal and regulatory requirements required by English law" or SEC and NASDAQ rules and regulations. [*Id.*] The Charter also says the Audit Committee must provide "regular reports and information to the Board with respect to material issues." [*Id.*] It also tasks the Audit Committee with reviewing "management's efforts to monitor compliance with the Company's programs and policies adhering to applicable laws and rules, including the [Code]." [*Id.*]

Exscientia's Remuneration Committee helps the Board oversee, among other things, the company's compensation policies, and executive officer compensation. [Remuneration Committee Charter at 1.] The Committee's Charter lays out the Committee's responsibilities, but the responsibilities—like those listed in the Nomination Committee's Charter—"are a guide and should remain flexible to account for changing circumstances and needs." [*Id.* at 2.] These responsibilities include, among other things, "reviewing, evaluating, and approving employment agreements" of Exscientia's executive officers. [*Id.*] The Charter also says the Remuneration Committee must review and approve compensation for the company's CEO, and "evaluate the [CEO's] performance in achieving corporate performance goals and objectives." [*Id.* at 2.] In evaluating the CEO's performance, the Charter says the Remuneration Committee must consider, among other things, the CEO's "fostering [of] a corporate culture that promotes the highest level of integrity and the highest ethical standards." [*Id.*]

C. **The #MeToo Movement**

Plaintiffs frame their claims around the #MeToo movement. [Am. Compl. ¶¶ 10-11, 47-57.] As Exscientia grew to new heights, so too did the #MeToo movement. Originally coined in 2006, MeToo is a phrase used "to promote awareness of sexual assault and sexual harassment." Michael Conklin, *#metoo Effects on Juror Decision Making*, 11 Cal. L. Rev. Online 179, 180 (2020). In response to reports of sexual assault or harassment, social media users would use the hashtag "MeToo" to share that they have been victims of sexual assault or harassment. Ann Nenoff, *#metoo: A Look at the Influence and Limits of "Hashtag Activism" to Effectuate Legal Change*, 2020 U. Ill. L. Rev. 1327, 1335 (2020). The #MeToo movement spread. Coupled with investigative journalism, the #MeToo movement led to the downfall of prominent executives, from the movie studio to the newsroom to the boardroom. [Am. Compl. ¶ 47.] *See also* Eleana Nicolaou & Courtney Smith, *A #MeToo Timeline to Show How Far We've Come — & How Far We Need to Go*, Refinery29, Oct. 5, 2019 (last updated), https://www.refinery29.com/en-us/2018/10/212801/me-too-movement-history-timeline-year-weinstein (last visited Aug. 24, 2025).

The #MeToo movement made its way to the UK and led to the outing and eventual ouster of prominent CEOs. [Am. Compl. ¶¶ 47-51.] The UK reacted, creating regulatory frameworks to address sexual harassment in the workplace. [*Id.* ¶ 48.] Since 2017, the UK has required public, private, and volunteer sector employers with 250 or more employees to report annually on their gender pay. [*Id.* ¶ 55.] Employers need not provide a narrative to describe the contexts of the pay gap or explain any actions the company will take to address the gap. [*Id.*]

### D. Exscientia's Public Filings

#### 1. The Form 20-Fs

Because Exscientia is a foreign company whose securities trade on the NASDAQ, *see* Am. Compl. ¶¶ 2, 4, the SEC requires it to file annual reports on a Form 20-F. *See generally* 17 C.F.R. §§ 240.13a-1, 240.15d-1, 249.220f. In March 2022, Exscientia filed its 2021 Annual Report on Form 20-F with the SEC reporting the company's financial and operational results for 2021. [Am. Compl. ¶ 89.] Hopkins signed the Form 20-F, and provided a certification required by the Sarbanes-Oxley Act of 2002 (SOX Certification), attesting to, among other things, the accuracy of the financial reporting and disclosure of all fraud involving management. [*Id.*; *see also* Wright Decl. ¶ 7, Ex. F (2021 20-F).]

In that 20-F, Exscientia stated the Code applies "to all of our employees, officers and directors and is available on our website." [Am. Compl. ¶ 90; *see also* 2021 20-F at 227.] Exscientia also described its "Culture" by stating:

> Diversity is an important area of focus for us. We are a global company, and our internationalism is reflected in our workforce which represents more than 30 nationalities, from six continents. We will continue to work on our internal initiatives and processes to ensure that Exscientia remains an inclusive and welcoming place to work for all while working to improve our sex, racial and cultural diversity at all levels in the organisation.

[Am. Compl. ¶ 102; 2021 20-F at 125.]

The 2021 20-F also disclosed commercial risks, including the risks of losing personnel and reputational harm. [Am. Compl. ¶¶ 98, 100; 2021 20-F at 62-63.] For example, Exscientia stated, "Our future success depends on our ability to retain key executives and to attract and motivate qualified personnel." [*Id.*] Exscientia stated it is "highly dependent" on, among others, "principal members of our management." [*Id.*] It added:

> The loss of the services of our executive officers or other key employees could impede the achievement of our development and sales goals in our software business and the achievement of our research, development and commercialisation objectives in our drug discovery business. In either case, the loss of the services of our executive officers or other key employees could seriously harm our ability to successfully implement our business strategy. Furthermore, replacing executive officers and key employees may be difficult and may take an extended period of time because of the limited number of individuals with the breadth of skills and experience required to successfully develop, gain regulatory approval of, and commercialise products in the life sciences industry.

[*Id.*]

Exscientia also said, "Our employees, independent contractors, consultants and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading laws, which could cause significant liability for us and harm our reputation." [Am. Compl. ¶ 100; 2021 20-F at 60.]

In March 2023, Exscientia filed its 2022 Annual Report on Form 20-F with the SEC reporting the company's financial and operational results for 2022. [Am. Compl. ¶ 108.] Like the 2021 Form 20-F, Hopkins signed a SOX Certification for the 2022 Form 20-F. [*Id.*; *see also* Wright Decl. ¶ 11, Ex. J (2022 20-F).] Exscientia's statements in the 2021 20-F mirrored those in the 2022 20-F. [Am. Compl. ¶ 109.] Hopkins' SOX Certifications for the 2021 and 2022 20-Fs matched. [*Id.*]

### 2. The Annual Reports

In April 2022, Exscientia filed a Form 6-K with the SEC announcing, among other things, its distribution of its annual report to its shareholders. [*Id.* ¶ 106.] Exscientia directed its shareholders to its website where they could find the company's 2021 Annual Report. [*Id.*] In that report, when discussing Exscientia's "Culture[,]" Exscientia referenced the Code, its

policies "that promote the principles of human rights[,]" and its efforts to "undertake an annual review of its policies and procedures to establish its position with regard to compliance and best practice, and monitor and promote a healthy corporate culture." [*Id.*; *see also* Wright Decl. ¶ 3, Ex. B (2021 Annual Report).] For the Code, Exscientia stated:

> The Group maintains and operates pursuant to a Code of Conduct and Business Ethics, which is designed to ensure the Group operates its business ethically and with integrity and to avoid actual or apparent conflicts of interests. The Group also maintains an Anti-Bribery Policy. The Code of Conduct and Business Ethics and Anti-Bribery Policy applies to all directors, officers, and employees of the Group.

[2021 Annual Report at 53.]

And for its employees' "human rights[,]" Exscientia "will respect" those rights, by, among other things, "ensuring employees are free from discrimination and coercion[.]" [*Id.*]

In April 2023, Exscientia filed a Form 6-K with the SEC that was very similar to its 2022 Form 6-K. [Am. Compl. ¶ 110.] It too directed shareholders to Exscientia's 2022 Annual Report available on its website. [*Id.*] The 2022 Annual Report's statements on the Code, respecting its employees' "human rights[,]" and its practice of policy review to "monitor and promote a healthy corporate culture" mirrored the 2021 Annual Report. [*Id.*; *see also* Wright Decl. ¶ 4, Ex. C (2022 Annual Report).]

### 3. The Gender Pay Gap Report

In April 2023, Exscientia published its UK Gender Pay Gap Report as required by United Kingdom law. [Am. Compl. ¶ 111; *see also* Wright Decl. ¶ 5, Ex. D (the Gender Pay Gap Report).] Hopkins authored the Gender Pay Gap Report's introduction, writing, "At Exscientia[,] we are committed to offering fair, equal, and unbiased recruitment, promotion, and reward mechanisms and an inclusive work environment." [Gender Pay Gap Report at

11

2.]  When discussing Exscientia's "[a]ctions" taken to close the gender pay gap, Exscientia said,

> Whilst we all need to recognise that [there] are no 'quick fixes' to resolving our Gender Pay Gap, we are committed to building on our progress so far and to continuing to foster a diverse workforce both within and beyond Exscientia. There are several actions we have been taking as a business and we will continue to focus on them to help improve the diversity of our workforce which will impact factors such as our gender pay gap.

[*Id.* at 6.]

Those actions include, among other things, "aim[ing] to ensure at least 50% of all vacant Executive Director and above roles are filled by women[,]" and working with "[a] non-profit organization supporting girls, young men, and non-binary people into [STEM] subjects or careers."  [*Id.*]  And in describing future actions, Exscientia wrote,

> Looking ahead . . . We need to play our part in encouraging girls to consider STEM (Science, Technology, Engineering, Mathematics) careers. Inspiring young women to work in STEM in our community will build a female talent pipeline for the long term. It's going to take some time for Exscientia and our peers to improve senior female representation.  Bringing these issues to life through initiatives like UK gender pay gap reporting is important for making sure we continue to progress in the right direction.

[*Id.* at 7.]

### E.  Complaints about Hopkins' Inappropriate Conduct and Hopkins' Downfall

As CEO, Hopkins had several assistants.  [Am. Compl. ¶¶ 58, 65.]  From November 2021 to December 2022, a female employee (who Plaintiffs have not identified) worked as the Strategic Assistant to Hopkins.  [*Id.* ¶ 58.]  The Court refers to this employee as "Female 1" (FE1).  During her time as Strategic Assistant to Hopkins, Hopkins "behav[ed] inappropriately" towards FE1 (Plaintiffs have not identified what Hopkins did or said to her). [*Id.* ¶ 59.]  Hopkins' inappropriate behavior "traumatized her."  [*Id.*]  According to FE1,

"Hopkins displayed a pattern of toxic behavior towards women." [*Id.* at 63 (internal quotation marks omitted).]

Sometime around August 2022, FE1 reported Hopkins' "inappropriate behavior towards her[]" to Nicholson. [*Id.* ¶ 60.] According to FE1, Nicholson "did nothing at all about it." [*Id.*] Nicholson did not report Hopkins' misconduct to the Board, but instead, engaged outside counsel. [*Id.* ¶ 61.] Given Hopkins' conduct and Nicholson's "refusal to act" on her report, FE1 felt she "had no choice but to leave" Exscientia. [*Id.*] She not only left Exscientia, "she move[d] hundreds of miles to get away from Hopkins" and "left the biotech industry" altogether. [*Id.* ¶ 62.]

FE1 knows that Hopkins had a relationship with another of his female assistants. [*Id.* ¶ 65.] Plaintiffs have not identified the name of this employee so the Court refers to her as "Female 2" (FE2). According to FE1, FE2 was the "Executive Assistant to the CEO" from July 2017 to October 2021. [*Id.*] FE1 claims that Hopkins had a relationship with FE2 "years" before Hopkins' "inappropriate behavior towards" her. [*Id.* ¶ 66.]

In February 2024, Exscientia filed a Form 6-K with the SEC and issued a press release announcing that Exscientia had terminated Hopkins' employment as CEO and Principal Executive Officer and removed him from the Board "for cause." [*Id.* ¶ 128; *see also* Wright Decl. ¶ 6, Ex. E (2024 Form 6-K) (Docket No. 26-3).] Exscientia's Board terminated Hopkins after an investigation uncovered he "had engaged in relationships with two employees that the Board determined were inappropriate and inconsistent with the Company's standards and values." [*Id.*] FE1 claims that she and FE2 are the two employees referenced in that press release. [Am. Compl. ¶¶ 59, 65.]

A Board special committee had retained outside counsel to investigate Hopkins' conduct. [2024 Form 6-K.] During that investigation, the Board learned that Nicholson knew about Hopkins' relationships and "had addressed the situation directly, and with the involvement of other outside counsel, rather than in consultation with the Board." [*Id.*] After "discussions with the Board," Nicholson chose to resign. [*Id.*; *see also* Am. Compl. ¶ 129.]

Following the press release, Exscientia's stock price plummeted, declining about 23% by the close of the day of the press release. [Am. Compl. ¶ 130.] This decline is "the largest single-day decline Exscientia stock experienced in the Company's history[.]" [*Id.*]

**F. The Lawsuit**

Months after Exscientia announced the firing of Hopkins and departure of Nicholson, litigation ensued. [*See generally* Compl. (Docket No. 1).] Plaintiffs sue Exscientia, Hopkins, and Nicholson for committing securities fraud. [*See generally* Am. Compl.] Plaintiffs claim that they made several misrepresentations or misleading statements that violated federal securities law. [*Id.* ¶¶ 89-127.] Those statements can be grouped into five categories: statements about (1) the Code (referenced in the 20-Fs and Annual Reports and the Code itself) (the Code Statements); (2) Exscientia's corporate culture and diversity efforts (found in the 20-Fs, Annual Reports, and the Gender Pay Gap Report) (the Corporate Culture and Diversity Statements); (3) the risk disclosure (contained in the 20-Fs) (the Risk Disclosure Statements); (4) Exscientia's committees, like the Nomination Committee (contained in Committee Charters) (the Charter Statements); and (5) the SOX Certifications.

1. *The Code Statements*

Plaintiffs claim that the Code Statements "were false and materially misleading when made" because when Exscientia made the statements about the Code, Hopkins had sexually

14

harassed and engaged in inappropriate relations with company employees, and as such, Hopkins did not comply with the Code. [Am. Compl. ¶ 97.] Nicholson did not comply with the Code either because he knew about Hopkins' inappropriate relationship and failed to act. [*Id.*] According to Plaintiffs, "the statements in the Code were not reflective of the true policy in place at Exscientia because Exscientia had an unwritten policy of condoning Hopkins' ethical transgressions and predatory behavior towards female employees[.]" [*Id.*]

    2. *The Corporate Culture and Diversity Statements*

Plaintiffs also challenge the Corporate Culture and Diversity Statements as false and misleading. [Am. Compl. ¶¶ 103, 107, 113-15.] For example, Plaintiffs claim that Exscientia's statement in the 2021 20-F, depicting Exscientia as an inclusive and welcoming place to work, was false given Hopkins' misconduct and inappropriate relationships with subordinates. [*Id.* ¶ 103.] They also assert Exscientia's statement in the 2021 Annual Report about "respect[ing]" its employees' "human rights" by "ensuring employees are free from discrimination and coercion" was false and misleading given Hopkins' conduct. [*Id.* ¶ 103.] Likewise, Plaintiffs claim Exscientia's statements in the Gender Pay Gap Report—that the company is "committed to offering . . . an inclusive work environment" and "to continuing to foster a diverse workforce"—were false and misleading given Hopkins' conduct towards women. [*Id.* ¶¶ 113-17.]

    3. *The Risk Disclosure Statements*

For the Risk Disclosure Statements, Plaintiffs assert those statements are misleading and incomplete because Exscientia failed to disclose Hopkins' and Nicholson's conduct. [*Id.* ¶¶ 99-101.] For example, Plaintiffs claim that Exscientia's disclosure—that "loss of the services of our executive officers or other key employees could seriously harm our ability to

15

implement our business strategy"—was misleading because when Exscientia made that disclosure, Hopkins had inappropriate relationships with subordinates, and as such, exposed Exscientia to the loss of Hopkins' services as CEO, which in turn, could harm Exscientia's business.  [*Id.* ¶ 99.]

### 4. *The Charter Statements*

They also challenge the Committee Charters as false and misleading.  [*Id.* ¶¶ 118-127.] Plaintiffs claim statements in the Committee Charters are false because Nicholson failed to follow them by not reporting Hopkins to the Board when FE1 disclosed Hopkins' misconduct to him.  [*Id.* ¶ 122, 124.]

### 5. *The Sox Certifications*

Lastly, Plaintiffs challenge the Sox Certifications as false and misleading because Hopkins signed the certifications knowing he had been violating the Code. [*Id.* ¶¶ 105, 109.] According to Plaintiffs, the Sox Certifications are false and misleading because the certifications attest to the accuracy of the underlying SEC filing, like the Annual Reports or 20-Fs, and the underlying filing contains false or misleading statements given Hopkins' misconduct.

## II. DISCUSSION

Defendants now move to dismiss this lawsuit, arguing Plaintiffs have not stated a plausible federal securities law claim.  [Defs.' Mem. of Law in Supp. of Mot. to Dismiss 9-30 (Defs.' Br.) (Docket No. 26-1).]

### A. Federal Securities Fraud Law

Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) outlaws "the 'use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative

or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (omission and alteration in original) (quoting 15 U.S.C. § 78j(b)).  The SEC, the agency tasked with implementing the Exchange Act, promulgated Rule 10-b, making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading." *In re Maiden Holdings, Ltd. Sec. Litig.*, ____ F. 4th ___, ___, 2025 WL 2406864, at *5 (3d Cir. Aug. 20, 2025) (alteration in original) (quoting 17 C.F.R. § 240.10b-5(b)).

"Together, § 10(b) and Rule 10b-5 imply a private cause of action for securities fraud." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d Cir. 2023). To prevail on a private securities fraud claim, a plaintiff must show:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

A plaintiff bringing a Section 10(b) claim must satisfy the "heightened pleading standards" imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA).  *City of Warren*, 70 F.4th at 680.  Rule 9(b) and the PSLRA "require facts to be pleaded 'with particularity.'"  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).  When pleading false and misleading statements, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [to] state with particularity all facts on which that belief is formed." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (quoting 15 U.S.C. § 78u-4(b)(1)); *see also City of Warren*, 70 F.4th at 680 (explaining Rule 9(b) requires a plaintiff to "describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity"). And when pleading scienter, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The PSLRA's "strong inference" requirement will be met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* The PSLRA requires courts to dismiss private securities fraud claims that lack particularized allegations of falsity and scienter. § 78u-4(b)(3)(A).

Defendants challenge Plaintiffs' claims on three-fronts: (1) they have not pled a false or misleading statement of material fact; (2) no scienter; and (3) loss causation is lacking. [Defs.' Br. at 9-30.] Despite that broad challenge, Defendants home in on the materiality and falsity element necessary to maintain a private securities action. [*Id.* at 9-21.] Defendants contend the statements Plaintiffs' challenge are either inactionable puffery or Plaintiffs have not shown the statements were false or misleading when made. This Court agrees with Defendants.

## B. Materiality and Falsity

In a securities fraud case, statements are "only actionable if, when read in light of all the information then available to the market or a failure to disclose particular information, [they] conveyed a false or misleading impression." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 (3d Cir. 2019) (citation and internal quotation marks omitted); *see also Matrixx Initiatives*, 563 U.S. at 38 ("To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'" (emphases in original) (quoting *Basic*, 485 U.S. at 238). For omissions, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (alterations and omission in original) (quoting *Matrixx Initiatives,* 563 U.S. at 44). Without a duty to disclose, "[s]ilence . . . is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17. "The duty to disclose arises 'when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure.'" *Williams*, 869 F.3d at 241 (quoting *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000)). But "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Id.* "Omissions are actionable only when they render some other affirmative statement misleading." *In re Walmart Inc. Sec. Litig.*, ___ F.4th ___, ____, 2025 WL 2487776, at *5 (3d Cir. Aug. 29, 2025); *see also Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 264 (2024) (explaining Rule 10b-5 "requires identifying affirmative

assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements 'not misleading'").

A false or misleading statement is not enough; a plaintiff must show that the "misstatement or omission is material." *Fan*, 927 F.3d at 716. "[T]his materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted) (quoting *Basic*, 485 U.S. at 231-32). "[C]orporate puffery does not qualify as material because reasonable investors do not rely upon such platitudes or 'consider [them] important in deciding how to [act].'" *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 589 (E.D. Pa. 2023) (alterations in original) (quoting *Aetna*, 617 F.3d at 283), *aff'd*, 2024 WL 1209513 (3d Cir. Mar. 21, 2024). So courts will set aside subjective or vague opinions and general statements of intent or optimism as immaterial, and thus, inactionable. *Aetna*, 617 F.3d at 283.

### 1. The Code Statements

#### a. Parties' Arguments

Defendants argue the Code Statements are inactionable puffery because the Code is "inherently aspirational" and SEC regulations and NASDAQ rules required Exscientia to adopt it. [Defs.' Br. at 9-10.] They argue that the Code does not guarantee compliance or that Code violators will be terminated. [*Id.* at 11.] At best, the Code constitutes "general statements about reputation, integrity, and compliance with ethical norms," and so, the Code is inactionable. [*Id.* at 11-12 (citation omitted).] And the fact that Hopkins and Nicholson executed an acknowledgment of the Code does not render the Code itself false or misleading;

the Code is still inactionable. [*Id.* at 12-13.]  Defendants also challenge Plaintiffs' pleading, arguing the Amended Complaint offers no particularized allegations about Hopkins' and Nicholson's alleged misconduct.  [*Id.* at 13-14.]

Plaintiffs counter, arguing the Code is actionable because:  (1) "the Code was a false statement of Exscientia's actual policy" given Hopkins' and Nicholson's conduct and their violations of the Code; (2) the Code was "not aspirational" but set forth conditions that Exscientia employees must follow or face discipline; and (3) the Code is not puffery given its mandatory and specific language, and the context in which Exscientia referenced the Code—in the wake of the #MeToo movement.  [Pls' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss 12-17 (Pls.' Opp'n Br.) (Docket No. 31).]  Plaintiffs argue that several courts have found codes of conduct actionable where, as here, executive-level employees violated the code, or their conduct was at odds with it.  [*Id.* at 14, 19-20 (collecting cases).]  Plaintiffs also contend they have pled particularized allegations about Hopkins' and Nicholson's alleged misconduct, and how they violated the Code.  [*Id.* at 19-21.]

### b.  The Code Statements are Inactionable Puffery.

Courts have consistently held that statements in a company's code of conduct are inactionable puffery.  *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *11 (D.N.J. Dec. 6, 2018) (*TD Bank*) (finding statements in company's code of conduct—such as "TD is committed to conducting its affairs to the highest standard of ethics, integrity, honest, fairness and professionalism – in every respect, without exception, and at all times"—"are general statements and immaterial puffery"); *accord Singh v. Cigna Corp.*, 918 F.3d 57, 61, 63-64 (2d Cir. 2019) (holding statements in company's code of ethics—like, "we have a responsibility to act with integrity in all we do, including any and all dealings with

government officials"—"are a textbook example of 'puffery'").  This is so because statements in a company's code of conduct are "inherently aspirational[.]"  *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *17 (D.N.J. Aug. 8, 2018) (quoting *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017)); *accord Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (explaining "a code of conduct is a declaration of corporate aspirations[,]" and holding statement in company's code of conduct "was a statement of aspiration").

Companies whose securities trade on American financial markets must adopt a code of conduct/ethics (or "explain why [they have] not done so").  17 C.F.R. § 229.406(a); *see also* NASDAQ Rule 5610.  Because companies are required to adopt codes of conduct, "the publishing of a code is not actually a statement or representation that it will be followed." *TD Bank*, 2018 WL 6381882, at *11 (citing *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009)); *see also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 686 (D. Colo. 2007) ("[T]he mandatory nature of the adoption of such a code makes clear that all public companies—whether run by crooks or angels—will adopt just such a code.")  And because companies must adopt codes of conduct, "[i]nvestors . . . gain no information about a corporation by its adoption of such a code." *Cognizant*, 2018 WL 3772675, at *18.  Many courts refuse to find statements in codes of conduct to be actionable securities fraud because allowing such claims "could turn all corporate wrongdoing into securities fraud." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (*HP*); *see also City of Roseville*, 686 F. Supp. 2d at 415 (finding "untenable" plaintiffs' argument that "any company with a code of ethics in

compliance with § 229.406 would be required to disclose all violations of that code or face liability under federal securities law")

That said, "[c]ourts have allowed claims based on alleged misrepresentations contained in a code of ethics or conduct to survive a motion to dismiss only in rare circumstances." *Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 560 (S.D.N.Y. 2020) (*Papa John's I*).   To name a few, those rare cases include:

- A company's failure to disclose code violations that were "so pervasive" showed that the company, "in fact, held none of its asserted aspirations" in the company's code of conduct, *see Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 533 (S.D.N.Y. 2020); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *5-7, *17 (S.D.N.Y. Nov. 26, 2018) (*Signet I*) (finding statements in company's codes of conduct and ethics about its "policy and procedures against sexual harassment" actionable where plaintiffs plausibly alleged a "*culture of pervasive* sexual harassment," which was "*rampant* at [the company] at all levels, including among senior executives," and which was the subject of a pending arbitration proceeding in which over 200 employees had "detail[ed] their experiences" with sexual harassment at the company (emphases added));

- A company having an "*unwritten policy" that "directly" contradicted a specific provision in the code of conduct rendered the company's code misleading, see Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 223-224 (E.D. Pa. 2021) (emphases added); and

- A company wielding its code of conduct to reassure the investing public about the company's integrity when faced with suspicion about internal misconduct (say bribery), "during a time of concern" (after public disclosure of a bribery investigation), *see In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (*Signet II*) (refusing to dismiss challenged statements contained in company's codes of conduct and ethics where company issued the challenged statements "[i]n the face of a credible accusation . . . that [company] suffered from *rampant sexual harassment*," and the company's statements were designed to "reassure the investing public that [company] did not, in fact, have a *toxic workplace*" (emphases added)).[3]

---

[3] For more examples, see *CBS*, 433 F. Supp. 3d at 532 nn. 5-7 (collecting "rare" cases allowing statements in codes of conduct to survive a motion to dismiss).

The Code Statements here fall outside those "rare cases" to escape dismissal. The statements in the Code that Plaintiffs challenge are "broad, aspirational, and vague," and so, inactionable puffery. *Papa John's I,* 444 F. Supp. 3d at 561. The Code itself recognizes that it is "a statement of certain fundamental principles, policies and procedures that govern Exscientia personnel in the conduct of our business." [Code at 3.] Its stated purpose is "to deter wrongdoing as well as the appearance of wrongdoing." [*Id.* at 1.]

Courts have routinely found codes of conduct like the Code here to be inactionable. *See, e.g.*, *Braskem,* 246 F. Supp. 3d at 755 (finding company's code of conduct inactionable where the code "was adopted to establish . . . ethical principles and rules of conduct" and company "expects its members to adhere to certain standards and that employees should not [make certain] statements" (internal quotation marks omitted, emphasis removed)); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (finding statements in code of conduct inactionable puffery, reasoning that the code's language—"the [c]ode was adopted 'to deter wrongdoing' and 'promote . . . honest and ethical conduct'"—to be "explicitly aspirational" (citation omitted, omission in original)).

Many of the Code's statements— like "We are committed to maintaining the highest standards of business conduct and ethics" and Exscientia employees "must . . . do[] the right thing even when 'no one is looking[,]'" Am. Compl. ¶¶ 91-92—are inactionable puffery. *See, e.g.*, *Reiner v. Teladoc Health, Inc.*, 2020 WL 6343217, at *9 (S.D.N.Y. Sept. 4, 2020) (finding company's "statements that it was 'committed' to the 'highest standards of integrity and ethics'" inactionable puffery, and collecting cases finding similar statements made by companies to be puffery), *report and recommendation adopted as modified*, 2020 WL 7028638 (S.D.N.Y. Nov. 30, 2020); *see also HP*, 845 F.3d at 1276-77 (ruling code of conduct

24

"inherently aspirational" and finding statements in company's code of conduct—like, making decisions and behaving in ways "that reflect our commitment to doing the right thing" and "commit[ting] together . . . to conducting business consistent with the high ethical standards"—could not be objectively verifiable, and as such, did not constitute affirmative misrepresentations). And the Code's statements about Exscientia and its employees operating the company "business ethically and with integrity" and complying with the "spirit of all laws[,]" Am. Compl. ¶¶ 91-92, are puffery too. *Papa John's I,* 444 F. Supp. 3d at 561 (finding statements in company's code of conduct— that employees must "exhibit the highest ethical standards in dealing with customers and colleagues, guided by principles of honesty, fairness, mutual respect, trustworthiness, courage and personal and professional commitment[,]" and "to comply[] with all applicable labor and employment laws and regulations, to ensure a working environment free of harassment or other intimidating, hostile or offensive behavior based" on race and gender, among other characteristics and identities"—inactionable puffery (internal quotation marks omitted); *see also Allegheny Cnty.*, 532 F. Supp. 3d at 224 (finding statement in company's code of conduct—"[e]very Employee is expected to act with honest[y] and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment"—inactionable puffery).

Nothing in the Code guarantees that Exscientia or its employees would have the "highest standards of business conduct and ethics" or its employees would perform their duties "ethically, honestly and with integrity" or comply with all laws. *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (holding statements in code of conduct inactionable because they offered no assurance of company's

"compliance efforts will be successful" and finding statements in code "merely set forth standards in generalized terms that [company] hoped its employees would adhere to"). The Code says, "Exscientia *strives* to comply with all applicable laws and regulations." [Code at 3 (emphasis added).] Striving to comply is not an assurance of actual compliance. *See Jun v. 500.com Ltd.*, 2021 WL 4813192, at *12, *14-15 (E.D.N.Y. Aug. 13, 2021) (finding statements in code of ethics—"employees should strive to comply with the law and conduct business honestly, fairly and in the best interests of the Company" and "[e]mployees have an obligation to comply with all laws, rules and regulations applicable to the Company's operations"—inactionable), *report and recommendation adopted*, 2021 WL 4260644 (E.D.N.Y. Sept. 20, 2021); *see also Ferris v. Wynn Resorts Ltd.*, 2021 WL 3216462, at *10 (D. Nev. July 28, 2021) (finding statements in company's code of conduct, such as "we continuously strive to abide by high standards of ethical business conduct[,]" inactionable). Likewise, the Code's provision on reporting code violations provides no guarantees either. That provision says, "We expect our employees to do their best to comply with this policy." [Code at 4.] Like striving for compliance, expecting employees to do their best is no guarantee that they will, and so, this is inactionable puffery. *See Allegheny Cnty.*, 532 F. Supp. 3d at 224; *see also In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 158-59 (E.D.N.Y. 2020) (holding statement in company's code of ethics—company "expects all of its employees . . . to comply with applicable law, deter wrongdoing and to abide by [company's] Code of Conduct"—inactionable, reasoning the statement "is a generalized, aspirational statement about how [the company's] 'expects' its employees to comport themselves"); *Braskem*, 246 F. Supp. 3d at 755 (finding statements in code of conduct that company "'*expects* its members' to adhere to certain standards" to be aspirational, and thus, inactionable (emphasis in original)). Words like "strive" and "expect"

in the Code show that the Code is aspirational and forward-looking. *See, e.g.*, *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *9 (N.D. Ill. Mar. 30, 2022).

What's more, the Code provides no assurance to investors that sexual harassment—at any corporate level—would not occur. Indeed, the Code is silent on sexual harassment. And for that reason, Plaintiffs cannot rely on *Allegheny County*. In that case, the company's code of conduct had a specific provision called "Sensitive Payments" that prohibited paying or receiving money from government officials or employees, such as police officers or constables. 532 F. Supp. 3d at 221, 224. Despite that explicit policy, the plaintiffs there alleged that the company had an "unwritten policy to hire armed, uniformed constables to create an appearance that they were acting in their official capacity." *Id.* The company had a history of hiring uniformed officers to serve as security guards. *Id.* at 221-22. In fact, the plaintiffs pointed to an email where one of the defendant's employees responsible for security wrote, "'Energy Transfer has an unwritten policy' of hiring 'On Duty' uniformed officers, such as Constables." Id. at 221. The *Allegheny County* court found that "unwritten policy . . . directly contradicts the sensitive payments policy proffered in the Code of Ethics." *Id.* at 224. That direct contradiction "rendered portions of the [company's code] misleading." *Id.* at 223.

But the "direct contradiction" that made the company's code of conduct misleading in *Allegheny County* is missing here. Other than vague and general assertions about acting ethically, honestly, with integrity, complying with laws, and avoiding conflicts of interest, *see* Code at 1, 3, Plaintiffs have not pointed to an "unwritten policy" at Exscientia that contradicts

27

the Code's specific provisions.  Said another way, Plaintiffs have not alleged that Exscientia had a policy that it knew was not what the company actually practiced.[4]

Plaintiffs conflate a company's adoption of a code of conduct prohibiting certain conduct and an employee's violation of that code.  The latter does not make the former false or misleading.  *See Tenaris*, 493 F. Supp. 3d at 158-59 (finding "immaterial" company's code of ethics statement that company "expects all of its employees . . . to comply with applicable law, deter wrongdoing and to abide by [company's] Code of Conduct[,]" and finding company's executive alleged violation of the ethics code did not render statement "misleading").  Merely adopting a code of conduct—without more—is not a representation to investors that no employee will violate it.  *See Braskem*, 246 F. Supp. 3d at 756 ("There is an important difference between a company's announcing rules forbidding bribery and it[] factually representing that no officer has engaged in such forbidden conduct."); *see also HP*, 845 F.3d at 1278 (ruling that company's "promotion of ethical code . . . did not reasonably

---

[4] Likewise, Plaintiffs' reliance on *Banco Bradesco* is misplaced.  [Pls.' Opp'n Br. at 14, 18.]  There, the court found the company's code of conduct itself not actionable even with "its relatively forceful wording" because the code's statements were "aspirational and hortatory[.]"  *Banco Bradesco*, 277 F. Supp. 3d at 658.  But the court found the company's statements *about* the code and the company's anti-corruption policy in SEC filings were actionable. *Id.* at 659.  In doing so, the *Banco Bradesco* court found those statements specifically addressed bribery and corruption and compliance with the law at a time when the "public had learned of the vast bribery revelations stemming from" an investigation into "bid-rigging and bribery at Brazil's state-owned oil company." *Id.* at 621, 659.  The company had told investors it had adopted an "effective process for preventing and combatting corruption and bribery" that included discipline for violations.  *Id.* at 660.  When the company made those statements, however, the company's managing officer:  (1) "was fully aware that the policy was not effective, since he was knowingly involved in the scheme to bribe [a government official[;]" and (2) knew "that discipline was in fact not being imposed[.]" *Id.*

Unlike *Banco Bradesco*, Exscientia's statements about the Code in the 20-Fs and Annual Reports did not specifically address the Company's policy on sexual harassment or inappropriate workplace relationships. [2021 20-F at 227; 2022 20-F at 234; 2021 Annual Report at 53; 2022 Annual Report at 60.]  And when Exscientia filed those 20-Fs and Annual Reports, the public had not learned about Hopkins' misconduct. *Banco Bradesco*, 277 F. Supp. 3d at 660.  Said differently, Exscientia did not reference the Code in those filings "in an effort to reassure the investing public about the Company's integrity . . . during a time of concern" like the company in *Banco Bradesco* did.  So *Banco Bradesco* is different.

suggest that there would be no violations of the [code of conduct] by the CEO or anyone else").

Plaintiffs cannot shoehorn their case into the "rare cases" that have escaped dismissal. Take *Signet I* as an example. There, the court found certain statements in Signet's code of conduct actionable because those statements were contradicted by internal misconduct alleged in the complaint. 2018 WL 6167889, at *17. Signet's code said the company made employment decisions based solely on merit and that employees could report workplace misconduct through an anonymous process without retaliation. *Id.* Yet the Signet plaintiffs alleged that the company "conditioned employment decisions on whether female employees acceded to sexual demands . . . and retaliated against women who attempted to anonymously report sexual harassment." *Id.* Those plaintiffs painted a picture of Signet's "[c]ulture of '[p]ervasive' [s]exual [h]arrassment" that "was rampant at Signet at all levels," and had prompted 200 employees to file affidavits detailing that sexual harassment and retaliation for reporting it in a pending arbitration. *Id.* at *5-7.

Even accepting Plaintiffs' allegations as true, Hopkins' alleged inappropriate conduct is not akin to the egregious company-wide sexual harassment and zero enforcement alleged in *Signet I.* Unlike *Signet I*, which involved about two hundred employees and sexual harassment at every corporate level, Plaintiffs have only alleged that a single executive, Hopkins, had an inappropriate relationship with two subordinates.[5] [Am. Compl. ¶¶ 58-59, 65-66.] And unlike *Signet I*, Plaintiffs make no allegation that Exscientia, Hopkins, Nicholson or any Exscientia employee retaliated against FE1 for reporting Hopkins' conduct. While the

---

[5] The Amended Complaint alleges that FE1 is aware of "another female employee . . . who also was a victim of Hopkins' misconduct." [Am. Compl. ¶ 63.] This allegation is vague and conclusory. Plaintiffs offer no information about this female employee or Hopkins' supposed misconduct toward her.

*Signet* plaintiffs alleged zero enforcement of the company's sexual harassment policy, Plaintiffs have alleged enforcement because the Amended Complaint has several allegations that Exscientia "acted as [the Code] said it would." *CBS*, 433 F. Supp. 3d at 535 (finding that "even if the complained-of statements [in company's code of conduct] were material statements of fact, the Amended Complaint does not allege that they were false or misleading[]" because complaint alleged that company did what the code "said it would" like conducting investigations and taking disciplinary actions).

Indeed, FE1 reported Hopkins' conduct to Nicholson, Nicholson engaged outside counsel, the Board special committee engaged outside counsel to investigate Hopkins' conduct, an investigation followed, and the Board terminated Hopkins "for cause" given his inappropriate relationships with two employees. [Am. Compl. ¶¶ 60-61, 75, 128; *see also* 2024 Form 6-K.] Plaintiffs' allegations that Nicholson retained outside counsel to "conceal" Hopkins' conduct, Am. Compl. ¶¶ 17, 61, 75, or that Exscientia had an "unwritten policy" of not investigating Code violations, Pls.' Opp'n Br. at 17, are conclusory and Plaintiffs could provide no further elaboration at oral argument. *See CBS*, 433 F. Supp. 3d at 535 (finding allegation "that sexual harassment was pervasive and widespread at company . . . conclusory" where plaintiffs supported that allegation "by only a handful of examples from a company with over 12,000 employees").

Plaintiffs press on, arguing "context matters" to determine whether a statement qualifies as inactionable puffery. [Pls.' Opp'n Br at 16 (quoting *Signet II*, 389 F. Supp. 3d at 230).] That context, Plaintiffs argue, is the #MeToo movement, the high profiling firings of corporate executives for inappropriate workplace relationships, and UK laws on gender pay gap. [*Id.*] Given that context, they say the Code Statements are actionable. Not so.

True, context matters, and courts cannot view statements in isolation to determine whether a statement is inactionable puffery. *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003) ("To determine whether a statement is puffery, a court must examine the context in which the statement was made"); *accord Signet II*, 389 F. Supp. 3d at 230; *Banco Bradesco*, 277 F. Supp. at 660. But the "context" here cannot save the Code Statements from dismissal. Indeed, Exscientia did not make the Code Statements "to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance." *CBS*, 433 F. Supp. 3d at 532. Unlike here, that was the context in *Signet II* where the court found the company's statements in the code of ethics actionable. *See* 389 F. Supp. 3d at 230 (statements about code of conduct and corporate policies made "[i]n the face of credible accusation . . . that Signet suffered from rampant sexual harassment" actionable where "[d]efendants sought to reassure the investing public that Signet did not, in fact, have a toxic workplace"); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (refusing to find company's "alleged statements regarding its general integrity and ethical soundness" inactionable puffery where company made "statements . . . repeatedly in an effort to reassure the investing public about the Company's integrity").

The #MeToo movement and its fallout—alone—cannot turn otherwise aspirational statements in a company's code of conduct into actionable statements for securities fraud liable. Courts have routinely found statements in codes of conduct inactionable even when made during the height of the #MeToo movement. *See generally CBS*, 433 F. Supp. 3d at 525-29, 532-35; *see also Papa Johns I*, 444 F. Supp. 3d at 560-61. Accordingly, the Code Statements are inactionable puffery.

### c. Defendants had no duty to disclose Hopkins' and Nicholson's misconduct.

Exscientia had no duty to disclose Hopkins' and Nicholson's misconduct because omitting that information did not render the Code Statements misleading. *Williams*, 869 F.3d at 24; *see also Walmart*, ___ F.4th at ___, 2025 WL 2487776, at *5. Nothing in the Code Statements suggested or implied executive employees complied with the Code or would not violate it. *HP*, 845 F.3d at 1278.

Exscientia's failure to disclose Hopkins' and Nicholson's violations of the Code does not make the Code Statements false or misleading. *City of Roseville*, 686 F. Supp. 2d at 415 (ruling plaintiffs failed to pled that the statements in company's "Code of Ethics" were false and misleading, and rejecting plaintiffs' argument that company had a duty to disclose violations of the code and company's corporation's failure to disclose such violations rendered the code itself misleading); *see also HP*, 845 F.3d at 1278 (holding corporation had no duty to disclose CEO's violation of company's ethical code, reasoning that "the fact that [company] and [CEO] enhanced and touted the [company's code of ethics] does not, without more, transform [CEO's] misbehavior into an actionable material omission under the securities laws").

Likewise, Hopkins' general references to the Code in the 20-Fs and Annual Reports do not make the Code Statements false or misleading even though Hopkins had allegedly violated the Code when he made those references. *See Andropolis,* 505 F. Supp. 2d at 685-86 (finding company's omission that CEO and CFO were violating the code of conduct at the time CEO signed Form 10-Q announcing the adoption of the code was not misleading). And that Hopkins and Nicholson signed an acknowledgment of the Code does not guarantee that they would not violate it. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 977 (N.D. Cal.

2015) ("Acknowledging an understanding of and commitment to Polycom's Code of Business Ethics is simply not the same as warranting that Miller would never violate the policy in the future.").

Because the Code Statements do not create an impression that Hopkins or Nicholson (or any other employee) would fully comply with the Code, Defendants had no duty to disclose Hopkins' or Nicholson's violations of it. *HP*, 845 F.3d at 1278. Thus, the Code Statements are not false or misleading.

### 2. The Corporate Culture and Diversity Statements

#### a. Parties' Arguments

Like the Code Statements, Defendants argue the Corporate Culture and Diversity Statements are inactionable. [Defs.' Br. at 14-17.] First, Defendants contend Plaintiffs have not alleged that the Corporate Culture and Diversity Statements were false when made. [*Id.* at 14-15.] Second, Defendants assert those statements are "textbook inactionable puffery." [*Id.*] Defendants argue courts routinely find statements like the Corporate Culture and Diversity Statements—such as "[d]iversity is an important area of focus for us" and "[w]e will continue to work . . . to ensure that Exscientia remains an[] inclusive and welcoming place to work for all"—to be inactionable puffery. [*Id.* at 14-16 (collecting cases).] Third, Defendants argue the PSLRA safe harbor for forward-looking statements protects many of the Corporate Culture and Diversity Statements. [*Id.* at 16-17.]

Plaintiffs push back, first arguing the PSLRA safe harbor does not protect many of the Corporate Culture and Diversity Statements because the statements "are concrete representations of present and historical fact[.]" [Pls.' Opp'n Br. at 21.] Likewise, some statements "are actionable because they are mixed/present future statements" that the

PSLRA safe harbor does not protect. [*Id.* (citation and internal quotation marks omitted).] Next, Plaintiffs argue the Amended Complaint shows how the Corporate Culture and Diversity Statements were false given Hopkins' conduct. [*Id.* at 22.] Plaintiffs contend that Exscientia's statements on "respect[ing] human rights" and creating a workplace "free from coercion" were false because Hopkins sexually harassed female employees. [*Id.*]

Setting the PSLRA aside, Plaintiffs argue the Corporate Culture and Diversity Statements are not puffery. [*Id.* at 23.] They contend whether a statement qualifies as puffery is a factual question that cannot be answered on a motion to dismiss. [*Id.*] They also assert that the context when Defendants made the statements—the #MeToo movement and its fallout—show these statements were material and thus not puffery. [*Id.*]

### b. The Corporate Culture and Diversity Statements are inactionable.

The Corporate Culture and Diversity Statements are inactionable puffery. Again, a statement is immaterial, and thus, inactionable, if it involves a "subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism[.]" *Aetna*, 617 F.3d at 283. Such statements "lack an underlying factual basis[,]" and as such, do not violate federal securities law because they are immaterial. *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 548 (W.D. Pa. 2019); *see also City of Southfield Fire & Police Ret. Sys. v. Hayward Holdings, Inc.*, 2025 WL 1577315, at *12 (D.N.J. June 4, 2025) (explaining "statements that are 'determinate' and 'verifiable' are not puffery" (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015))). Simply stated, "puffery cannot mislead the reasonable investor." *Howard,* 395 F. Supp. 3d at 548.

The Corporate Culture and Diversity Statements that Plaintiffs challenge here—like Exscientia's commitment to diversity and fostering an inclusive work environment, Am.

Compl. ¶¶ 102, 109, 113-14—have routinely been found to be inactionable puffery. *See, e.g.*, *Kiger v. Mollenkopf*, 2021 WL 5299581, at *2 (D. Del. Nov. 15, 2021) (finding company's statement in proxy statement—"The Governance Committee's goal is to assemble a board of directors that brings to us a diversity of perspectives and skills"—inactionable puffery); *Ocegueda ex rel. Facebook v. Zuckerberg*, 526 F. Supp. 3d 637, 651 (N.D. Cal. 2021) (finding Facebook's statements about its commitment to diversity were "non-actionable puffery or aspirational"); *Lopez*, 173 F. Supp. 3d at 28 (finding company's statements about commitment to a "diverse workforce" and "an inclusive and positive working environment" to be "immaterial puffery" and "too hazy and general for any reasonable investor to have relied upon them"). Indeed, many of the challenged statements contain explicitly aspirational language, such as "we are committed to" and "we aim to ensure[,]" Am. Compl. ¶¶ 113-15[6], and thus are statements of Exscientia's goals—nothing more. *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298 (S.D.N.Y. 2019) (finding statements in company's ethics code and anti-bribery policies inactionable puffery, reasoning that "[m]any of the statements were preceded by explicitly aspirational language (*e.g.*, 'committed to'; 'tr[ies] to ensure'), thus unmistakably signaling that they were statements about goals, not statements of fact"); *see generally City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (explaining statements with "qualifiers such as 'aims to,' 'wants to,' and 'should'" are "aspirational"). Those statements cannot be objectively verified, and so, they are inactionable. *See City of Pontiac Gen. Employees' Ret. Sys. v. Bush*, 2022 WL 1467773, at *4 (N.D. Cal. Mar. 1, 2022) (holding company's statements that "emphasize a desire to commit

---

[6] *See also* 2021 Annual Report at 53 ("The Group is *fully committed* to the elimination of unlawful and unfair discrimination and values the differences that a diverse workforce brings to the organization." (emphasis added)); 2022 Annual Report at 60 (same).

to and embrace diversity" inactionable, reasoning statements are "aspirational, . . . not capable of objective verification[,]" and "quintessential, non-actionable puffery" (citations and internal quotations marks omitted).  Accordingly, no reasonable investor would put stock in these statements when making an investment.  *See Stichting Pensioenfonds Metaal en Techniek v. Verizon Commc'ns, Inc.*, 775 F. Supp. 3d 826, 844-45 (D.N.J. 2025).

Likewise, Exscientia's statements in the Annual Reports about "respect[ing]" its employees' "human rights" by "ensuring employees are free from discrimination and coercion[,]" Am. Compl. ¶¶ 106, 110, are inactionable puffery.  *See Papa John's I*, 444 F. Supp. 3d at 560-61 (finding statements in ethics code—that company and employees are "committed . . . to ensure a working environment 'free of harassment or other intimidating, hostile or offensive behavior based' on race and gender, among other characteristics and identities"— to be "quintessential puffery").  Indeed, nothing in the Annual Reports describes specific steps Exscientia takes to ensure its employees "are free from discrimination and coercion."  *See CBS*, 433 F. Supp. 3d at 534 (finding statements in company's "Business Conduct Statement"—that company "'will' take 'all steps' and 'remedial action' to stop 'sexual harassment' and 'protect the workplace environment[]'" and "'will promptly and thoroughly investigate' allegations of sexual harassment"—to be immaterial because statements "fail[ed] entirely to elaborate on what exactly the Company would do to prevent or respond to workplace sexual harassment").

The remainder of the Annual Reports underscore the aspirational nature of Exscientia's statements about "respect[ing]" its employees' "human rights[.]"  For example, right below Exscientia's statement about respecting human rights, Exscientia stated it "endeavours to not discriminate because of . . . sex," 2021 Annual Report at 53, 2022 Annual

36

Report at 60.  Read its entirety, Exscientia's statements in the Annual Reports reflect the company's goals for achieving a discrimination-free workplace.  Those goal-oriented statements "are inactionable puffery."  *Kiger*, 2021 WL 5299581, at *2; *see also Verizon*, 775 F. Supp. 3d at 844-45 (finding company's statement—that company "is committed to maintaining a safe workplace and environmentally responsible work practices, and we expect our suppliers to share that commitment[]"—inactionable puffery (emphasis removed)).

Plaintiffs resist those conclusions, arguing Exscientia's statements in the Gender Pay Gap Report are not puffery because Exscientia made those statements to "distinguish [it] as being a progressive company in terms of promoting the careers of women in the male-dominated STEM field."  [Pls.' Opp'n Br. at 23.]  Pointing to *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006), Plaintiffs argue Exscientia's attempt to distinguish itself made the Gender Pay Gap Report statements actionable.  [*Id.*]  That is wrong.  *Goldman Sachs* is different.

There, Goldman Sachs touted its stock research "as high quality, unbiased" that "relie[d] on objective criteria" and made statements noting the company's "high ethical standards and its compliance with industry rules and regulation."  *Goldman Sachs*, 506 F. Supp. 2d at 229-30.  Goldman Sachs also "attempted to distinguish itself from other institutions based on its 'truly independent investment research[.]'"  *Id.* at 240.  The *Goldman Sachs* court found those statements actionable because at the time the company made them, the company "knew about the pervasive conflicts and the effect they had on its research reports and buy recommendations[.]"  *Id.*  The court explained that the plaintiffs did "more than identify rosy predictions or vague statements about Goldman's integrity."  *Id.*  The court

37

reasoned that when Goldman Sachs touted its unbiased investment research, the company knew about the conflicts and failed to disclose them to investors. *Id.*

Unlike *Goldman Sachs*, Exscientia's statements in the Gender Pay Gap Report about its commitment to offering an inclusive work environment and fostering a diverse workforce "were all pitched at a general and an aspirational level." *Braskem*, 246 F. Supp. 3d at 756 (distinguishing *Goldman Sachs*); *see also Lopez*, 173 F. Supp. 3d at 30 (same). Aside from Exscientia's statement about "currently volunteer[ing] with Stemettes[,]" Am. Compl. ¶ 115, the Exscientia's statements in the Gender Pay Gap Report that Plaintiffs challenge contain no "historical representations." *Braskem*, 246 F. Supp. 3d at 756 (finding statements in company's ethics code inactionable). In fact, several of the statements are forward looking, like "we aim to" and "Looking Ahead." Am. Compl. ¶¶ 115-16. Thus, the Corporate Culture and Diversity Statements are inactionable.[7]

### 3. The Risk Disclosure Statements

#### a. Parties' Arguments

Defendants argue that Plaintiffs' claim based on the Risk Disclosure Statements fails. [Defs.' Br. at 17-19.] Defendants assert the disclosures cannot be false or misleading because at the time Exscientia made them, the risk that Hopkins or Nicholson would be terminated or depart from the company had not materialized. [*Id.* at 18.] And pointing to the Third Circuit's decision in *Williams*, Defendants argue that risk disclosures are not actionable where the disclosed risk materializes after the disclosure. [*Id.* (citing *Williams*, 869 F.3d at 241-43).] They add that an increase in risk is not enough to make a risk disclosure misleading. [*Id.*]

---

[7] While Plaintiffs challenge Exscientia's statement about "volunteer[ing] with Stemettes[,]" Am. Compl. ¶ 115, they offer no explanation on how Exscientia's failure to disclose Hopkins' inappropriate conduct renders Exscientia's statement about the Stemettes false or misleading.

Defendants also contend "risks tied to investigative outcomes do not materialize until the investigation concludes." [Defs.' Reply Mem. of Law in Supp. of Mot. to Dismiss 7 (Defs.' Reply Br.) (Docket No. 32).]

Plaintiffs counter, arguing the risk disclosures were false and misleading because when Exscientia made those disclosures, Hopkins was engaging in misconduct that could have resulted in his termination. [Pls.' Opp'n Br. at 24.] Plaintiffs reject Defendants' argument that Exscientia's risk disclosures were not misleading because the risk of Hopkins' termination had not yet materialized. [*Id.* at 25.] At any rate, Plaintiffs argue that risk had materialized because FE1 had disclosed Hopkins' conduct to Nicholson before Exscientia made the risk disclosure in the 2022 20-F. [*Id.* at 26.] Plaintiffs argue that once Hopkins' misconduct "c[a]me to light[,]" his departure from Exscientia "was nearly inevitable." [*Id.*]

### b. The Risk Disclosure Statements are not false or misleading.

"Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 189 (D.N.J. 2022) (quoting *SEC v. Tecumseh Holdings*, 765 F.Supp.2d 340, 352 (S.D.N.Y. 2011)). In the Third Circuit, "a company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition." *Williams*, 869 F.3d at 242; *see also id.* at 243 (holding "risk disclosures were not materially misleading" where the disclosed risk had not "actually materialized at the time of" disclosure); *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *4 (3d Cir. June 14, 2022) (holding that plaintiffs failed to plead a false or misleading statement, reasoning the risk disclosures in SEC filings were not false or misleading because risks "had not actually materialized at the time that the statements were made"); *accord CBS*, 433 F. Supp. 3d at 536

("Risk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized.").

"Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams*, 869 F.3d at 241. But "[d]isclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Reiner*, 2020 WL 6343217, at *12 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).

Here, Exscientia's failure to disclose Hopkins' and Nicholson's misconduct did not render the Risk Disclosure Statements false or misleading because the identified risks had not yet materialized when the disclosures were made.

Start with the loss of key personnel disclosure. Exscientia warned investors that the "loss of services of our executive officers and other key employees could seriously harm our ability to successfully implement our business strategy." [Am. Compl. ¶ 98.] That risk disclosure has two components: (1) a triggering event—loss of executive officers and key employees; and (2) the effect—commercial harm. [*Id.*] The actual risk Exscientia warned of is the risk of commercial harm. *See Williams*, 869 F.3d at 242-43 (explaining that in the risk disclosure—"if any of our independent distributors were to cease to do business with us, our sales could be adversely affected"—"[t]he risk actually warned of is the risk of adverse effects on sales—not simply the loss of independent distributors generally"). Plaintiffs have not alleged that when Exscientia made that risk disclosure, Exscientia had lost the services of executives or other key employees or that it began to suffer commercial harm. Put differently, Plaintiffs have not alleged the risk of commercial harm had materialized when Exscientia

made the risk disclosure.  *Id.*; *cf. Howard v. Arconic Inc.*, 2021 WL 2561895, at *6 (W.D. Pa. June 23, 2021) (finding "statements warning about potential compliance issues and safety risks could plausibly be found to have been misleading because they failed to disclose an allegedly ongoing and systematic sales practice of a sufficient magnitude that increased the likelihood of that risk materializing in a serious way").

Plaintiffs protest, arguing that once FE1 disclosed Hopkins' inappropriate conduct to Nicholson, Hopkins' forced departure from Exscientia "was nearly inevitable."  [Pls.' Opp'n Br. at 26.]   Because Hopkins' termination was a foregone conclusion, Plaintiffs say, Exscientia's risk disclosure was false or misleading because the risk Exscientia would lose Hopkins' services had materialized.  [*Id.*]  This is pure speculation.  To start, even accepting Plaintiffs' allegations as true, FE1 only made an accusation that Hopkins engaged in inappropriate conduct.  Under the Code, Exscientia would investigate reported violations of the Code.  [Code at 3.]  But Exscientia had no obligation to disclose to investors an allegation of wrongdoing or violation of the Code without first having conducted an investigation into FE1's complaint.  *See CBS*, 433 F. Supp. 3d at 537 ("It would have been strange—and irresponsible—for CBS to publicly predict the outcome of its independent investigation into [CEO] before the investigation was complete or to disclose that [CEO] was at risk of being ousted for having engaged in sexual misconduct based solely on rumors.").  Defendants' failure to disclose Hopkins' misconduct did not render the risk disclosure false or misleading.  *See Papa Johns I*, 444 F. Supp. 3d at 563 (finding "[s]tatements regarding [CEO's] importance to the Company were not misleading for having omitted unadjudicated allegations that might one day lead to his ouster"); *see also Reiner*, 2020 WL 6343217, at *6, *12 (finding company's failure to disclose executive's inappropriate relationship with subordinate did not render

company's risk disclosures about losing "executive officers or key employees" or "changes in [company's] executive management team" false or misleading).

What's more, nothing in the Code guaranteed Exscientia would terminate Hopkins had Nicholson promptly reported FE1's complaint to the Board. Indeed, the Code says Exscientia would take "appropriate action" against Code violators and Code violations "*may* result in disciplinary action." [Code at 3 (emphasis added).] Despite Plaintiffs' claims, Hopkins' termination was not set in stone. And while FE1's complaint may have increased the risk Exscientia would have fired Hopkins, which in turn, may have increased the risk of commercial harm, those increased risks—alone—do not render the risk disclosure false or misleading. *CBS*, 433 F. Supp. 3d at 538 ("An increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading.").

Turning to the employee misconduct risk disclosure, Plaintiffs have not alleged the identified risk had materialized when Exscientia made the disclosure. For that disclosure, Exscientia warned that its "employees . . . may engage in misconduct or other improper activities, . . . which could cause significant liability for us and harm our reputation." [Am. Compl. ¶ 100.] The actual risk Exscientia warned of is liability and reputational harm. [*Id.*] Plaintiffs offer no allegation that Defendants knew Exscientia's reputation was harmed or that it faced liability from employee misconduct when Defendants made the risk disclosures. *See Williams*, 869 F.3d at 242-43. And nothing in the risk disclosure represented that Exscientia's employees, even its CEO, would not engage in misconduct. *See, e.g., Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 719 (S.D.N.Y. 2018) (finding company's omission about CEO's misconduct did not render company's statements about the importance of CEO false or

misleading where statements did not "suggest that [CEO] was not engaged in the undisclosed improper activities"). In fact, the risk disclosure recognized that employee misconduct could occur. So the risk disclosure is not misleading.

### 4. The Charter Statements

#### a. Parties' Arguments

Defendants contend Plaintiffs' challenge to the Charter Statements fails because Plaintiffs cannot show the Charters were false and misleading. [Defs.' Br. at 19-21.] Defendants equate company committee charters to codes of conduct, and as such, a mere violation of a company charter is not a violation of federal securities law. [*Id.* at 20.] That aside, Defendants argue Plaintiffs have not plausibly alleged how Nicholson violated the Committee Charters because Plaintiffs have not alleged what FE1 "told Nicholson and what his investigation concluded." [*Id.* at 21.]

Plaintiffs counter, contending the Charter Statements are actionable because Defendants failed to perform the Committees' stated functions. [Pls.' Opp'n Br. at 27-30.] Pointing to *Craig v. Target Corp.*, 2024 WL 4979234 (M.D. Fla. Dec. 4, 2024), Plaintiffs contend committee charter statements are actionable where the committee fails to fulfill its stated responsibilities. [*Id.* at 28-29.] Thus, the Charter Statements here are actionable because "the statements in the Charters were not accurate representations of how the Committees in fact functioned" given Nicholson's conduct. [*Id.* at 29-30.] According to Plaintiffs, Nicholson did not comply with the Charters because he failed to notify the Board about FE1's complaint. [*Id.*]

### b.   The Charter Statements are not false or misleading.

Courts have found company statements about its committee's functions actionable where the committees were fictitious or entirely nonfunctional.  *See, e.g.*, *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 75 (D.C. Cir. 1980) (finding statements about audit committee in proxy statement false and misleading where audit committee did not exist, reasoning "[s]tating that an audit committee, with its implication of careful oversight, existed when it did not thus is misleading"); *see also Craig*, 2024 WL 4979234, at *9 (finding proxy statements that company's board "was monitoring for social and political risks" and delegated that task to a committee were false and misleading where plaintiff alleged committee was not monitoring for social or political risks relating to company's pride campaign).  But courts have found statements that merely describe a committee's functions or recite an executive's responsibilities—without more—not false or misleading.  *See Kooker ex rel. Hecla Mining Co. v. Baker*, 497 F. Supp. 3d 1, 7 (D. Del. 2020).

The Charter Statements here are not false or misleading.  To start, Plaintiffs do not claim the Committees did not exist or that the Committee Charters misrepresent committee members' responsibilities.  Rather, they claim the Charter Statements are false and misleading because Nicholson did not perform his responsibilities as required by the Charters.  [Pls.' Opp'n Br. at 29-30.]  Said simply, Nicholson did not do his job.  But nothing in the Charters suggests or implies that committee members will always fulfill their stated responsibilities.  The Charters make no historical representations about compliance.

Committee charters are like codes of conduct because companies are required to adopt them by law.  NASDAQ Rule 5605; NYSE Rule 303A.  Like codes of conduct, the mere adoption of a committee charter "simply does not imply that all of its directors and

officers" will abide by the charter.  *See Andropolis*, 505 F. Supp. 2d at 686; *see also City of Roseville*, 686 F. Supp. 2d at 415.   An executive's violation of a committee charter—by itself—does not render a company's statements about the charter or the committee's responsibilities false or misleading.  *Cf. Braskem*, 246 F. Supp. 3d at 756 ("There is an important difference between a company's announcing rules forbidding bribery and it[] factually representing that no officer has engaged in such forbidden conduct.").

At best, Plaintiffs only allege that Nicholson did not adequately perform his committee responsibilities because he did not immediately report FE1's complaint to the Board and recommend that Hopkins be fired.  [Am. Compl. ¶¶ 118-27.]  FE1 complained to Nicholson about Hopkins' misconduct in August 2022.  [*Id.* ¶ 60.]  Plaintiffs offer no allegation as to what FE1 specifically told Nicholson.  At any rate, Plaintiffs admit that at some point in time, Nicholson retained outside counsel.  [*Id.* ¶ 61.]  Plaintiffs' allegations that Nicholson did so to conceal Hopkins' misconduct from the Board are conclusory at best, which the Court need not accept.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).   Companies retain outside counsel to investigate internal malfeasance all the time.   Indeed, the Board itself retained outside counsel to investigate Hopkins' misconduct.   [2024 Form 6-K.]    In fact, the Committee Charters authorized committee members to retain outside counsel to perform committee functions.  [*See, e.g.*, Nomination Committee Charter at 2.]   That Nicholson did not perform his job to Plaintiffs' liking does not mean Exscientia's statements about its committees and their responsibilities are false or misleading.

And *Craig* cannot save the day for Plaintiffs. There, the court found Target's proxy "oversight statements" plausibly misleading because Target affirmatively represented that its Board and Governance & Sustainability Committee were "fulfilling the oversight"

responsibility for social/political risks and "conducting regular priority assessments"—present-tense attestations about actual monitoring in an area where plaintiffs pleaded prior boycotts and an executive admission that Target had not adequately assessed the risk, leading to "self-inflicted" backlash. 2024 WL 4979234, at *9. Unlike *Craig*, the Committee Charters do not state the committees were presently "fulfilling" their responsibilities; they expressly say the committees' responsibilities "are a guide and should remain flexible." [*See, e.g.,* Nomination Committee Charter at 2.] The Charters are mandated governance frameworks, not performance attestations.

### 5. The SOX Certifications

#### a. Parties' Arguments

Defendants contend Plaintiffs' challenge to the SOX Certifications fails because they have not shown that any of the other challenged statements were false or misleading. [Defs.' Br. at 21.] They assert that Plaintiffs base their entire challenge to the SOX Certifications on the underlying SEC filings, like the 20-Fs. [*Id*.] Because Plaintiffs have not shown the underlying SEC filings contain an actionable false or misleading statement, the SOX Certifications are inactionable. [*Id.*]

Plaintiffs push back, arguing the SOX Certifications are false or misleading because Exscientia's SEC filings contain false or misleading statements. [Pls.' Opp'n Br. at 30-31.] They claim the SOX Certifications are actionable because when Hopkins signed them, he knew Exscientia's 20-Fs contained false statements. [*Id.* at 31.]

#### b. The SOX Certifications are inactionable.

"SOX certifications are not disclosure documents *per se*." *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *7 (D.N.J. June 12, 2020). "[T]hey verify the accuracy

and completeness of disclosures," like the information contained in an underlying SEC filing, such as an annual report. *Id.*; *accord Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021) ("Either the SEC filings contain materially misleading statements (in which case those statements can form the basis for liability) or they do not contain such statements. An allegation that the certification is false and misleading adds nothing."). So, to determine whether a SOX certification is false or misleading, courts must look to the underlying filing accompanying the certification. *Zhengyu He*, 2020 WL 3169506, at *7 (finding 2015 and 2016 SOX certifications inactionable where plaintiffs failed to show the underlying annual reports were false or misleading); *accord Burns v. UP Fintechup Fintech Holding Ltd.*, 2025 WL 936539, at *8 (S.D.N.Y. Mar. 27, 2025) ("Because Plaintiff fails to adequately plead an actionable misstatement or omission regarding the Annual Reports, Plaintiff's claim based on the SOX certifications necessarily fails.").

Plaintiffs' challenge to the SOX Certifications rests on Exscientia's 20-Fs, which, in turn, contain, among other things, the Code Statements and Risk Disclosure Statements. [Am. Compl. ¶¶ 89-109.] As explained above, the statements Plaintiffs challenge are either inactionable puffery or Plaintiffs have not shown that those statements were false or misleading when made. Consequently, the SOX Certifications are inactionable. *Rosi*, 2021 WL 1177505, at *21 ("Absent any material misstatements or omissions in [company's] SEC filings, Defendants cannot be liable through their SOX certifications.").

\* \* \*

To sum up, Plaintiffs have not plausibly alleged that Defendants made a false or misleading statement of material fact. *Matrixx Initiatives,* 563 U.S. at 38. Thus, they have failed to state a claim under Section 10(b) and Rule 10b-5.

### C. Section 20(a) Liability

Section 20(a) of the Exchange Act imposes joint and several liability on "one who controls a violator of Section 10(b)." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) (citing 15 U.S.C. § 78t(a)). Section 20(a) liability "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) (citation and internal quotation marks omitted). So a Section 20(a) claim can rise or fall with a Section 10(b) claim. *See, e.g.*, *Feldman v. Scynexis, Inc.*, 2025 WL 2158517, at *12 (D.N.J. July 30, 2025) (dismissing Section 20(a) claim where plaintiff failed to state a claim under Section 10(b)).

Because Plaintiffs have not plausibly alleged that Defendants violated Section 10(b) or Rule 10b-5, Plaintiffs' Section 20(a) claim fails as well. *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 597 (D.N.J. 2005) (dismissing Section 20(a) claim because plaintiff failed to plead violation of Section 10(b) or Rule 10b-5).

## III. CONCLUSION

For the above reasons, the Court **GRANTS** Defendants' Motion to Dismiss (Docket No. 26). The Court **DISMISSES** the Amended Complaint **WITHOUT PREJUDICE**, and grants Plaintiffs leave to amend within thirty days from the date of the accompanying Order to address the foregoing deficiencies if they can. An accompanying Order of today's date shall issue.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

Dated: October 10, 2025